In the Interest of C.M.C., C.E.C., and G.L.C.

No. 14–07–00881–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 18, 2008.

Dan J. Spjut, William B. Connolly, Houston, TX, for appellants.

Sandra D. Hachem and Angela Moritz Craven, Houston, TX, for appellees.

Panel consists of Justices YATES, GUZMAN, and BROWN.

## OPINION ON REHEARING

JEFF BROWN, Justice.

We grant appellee's motion for rehearing, vacate and withdraw our prior opinion and judgment dated August 28, 2008, and issue this opinion on rehearing and judgment in their place.

This is an appeal from a judgment terminating the parental rights of a mother and father to their minor children. In two issues, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's termination findings. In two issues, the father challenges the legal and factual sufficiency of the evidence underlying the termination and the trial court's appointment of appellee Department of Family & Protective Services as sole managing conservator of the children. We affirm in part, and reverse and remand in part.

## I. Factual and Procedural Background

### A. Latanya

Latanya is the mother of C.M.C., C.E.C., and G.L.C.[1] On February 27, 2006, in response to a call regarding a disturbance, an officer from the Houston Police Department went to Latanya's residence. When the officer arrived, Latanya was threatening to kill someone at her home, and had "trashed" the apartment and cut the screens out of the windows with a knife. C.M.C., C.E.C., and G.L.C. were removed from the home and subsequently released into the custody of a maternal aunt. At the time, Latanya's daughter, C.M.C., was five years old, and her sons, C.E.C. and G.L.C., were four years old and one year old, respectively.

Pursuant to an order for emergency detention, Latanya was taken to Ben Taub Neuropsychiatry Hospital for evaluation. The assessment report reflects that, upon her arrival, Latanya, a "Katrina evacuee," was extremely psychotic, disorganized and delusional. It further noted that she was a danger to herself and others and continuously talked to and responded to herself. On February 28, Latanya was transferred to a mental-health facility for treatment. On March 8, the facility informed the court that Latanya's condition had improved and discharged her.

---

1. To protect the privacy of the parties in this case, we identify the children by their initials, and we identify the parents by their first names only. *See* TEX. FAM.CODE ANN. § 109.002(d) (Vernon 2002).

On March 9, 2006, a CPS caseworker learned from the children's maternal aunt that she had taken them to the home of their maternal grandmother, Joann Carter, in Louisiana. When a caseworker from the Louisiana Child Welfare Services office attempted to interview Carter and the children during a home visit two weeks later, she discovered that Carter had sent C.M.C., C.E.C., and G.L.C. back to Houston to live with their mother.

On March 29, 2006, in response to another call, an HPD officer returned to Latanya's home where he found her "acting very crazy." Following her emergency detention, an examining physician provided a preliminary medical examination to the court in which he concluded that Carter exhibited a psychotic disorder and that, due to her condition, she posed a substantial risk of serious harm to herself and to others and was in need of immediate restraint. Latanya was subsequently transported to an in-patient mental-health facility where a psychological assessment was conducted. Upon her arrival, Latanya exhibited "rambling speech, disorganized thinking, ... [was] visibly hallucinating, talking to herself, responding to internal stimuli, ... unable to give any relevant information at this time." Latanya had also refused to take her medication. On March 30, 2006, after Latanya was admitted for treatment, the department took emergency custody of C.M.C., C.E.C., and G.L.C. Following an evaluation by the Children's Crisis Care Center (known as "4 C's"), the children were placed in foster care. Latanya subsequently moved to Plaqmine, Louisiana, to live with her mother and her twelve-year-old daughter.[2] In August, 2006, Latanya began a prolonged in-patient stay at Behavioral Hospital under the care of Dr. Robert Blanche after which she participated in a day program.

On June 28, 2007, following a permanency hearing, the court approved the family-service plan established by the department and ordered that Latanya (1) complete psychological counseling and/or participate in counseling and psychiatric treatment with Dr. Robert Blanche and the Beacon Center (formerly known as the Synergy Day Partial Program) in Louisiana; (2) maintain contact with CPS regarding her current living location; (3) complete parenting classes; (4) complete a drug-and-alcohol assessment; (5) undergo random drug tests; (6) remain drug-free; (7) refrain from criminal activity; (8) maintain a safe and stable home; (9) provide financially for her children as well as provide evidence of her receipt of government assistance and/or disability; and (10) complete all services outlined in the department's family-service plan. The plan required, among other things, that Latanya maintain contact with her children through supervised family visits, attend all court hearings, and maintain contact with her caseworker.

The court conducted a bench trial on September 18, 2007. Six witnesses testified—Teresa McCartney, the therapist for C.M.C. and C.E.C.; Shaylonda Henderson ("Henderson"), the Department case worker; Demetria Hunt, Henderson's supervisor; C.M.C. and C.E.C.'s foster mother; Sheryl Androphy, the children's court-appointed advocate; and Latanya. The court admitted numerous exhibits, among them a "[p]hysician progress note/case discussion," signed by Dr. Blanche and dated June 22, 2007, and Androphy's report to the court.

McCartney testified that she had been C.M.C. and C.E.C.'s therapist for the sixteen months preceding trial, and had met with them together on a weekly, and sometimes bi-weekly, basis. She believes that C.M.C. and C.E.C. both suffer from post-

2. Latanya's eldest child is not a subject of this suit.

traumatic stress syndrome, C.E.C. exhibits extreme A.D.H.D. ("Attention Deficit Hyperactivity Disorder"), and C.M.C. shows signs of reactive-attachment disorder.

C.E.C. was four years old when he began therapy. At that time, he was extremely traumatized and violent, and his behavior was erratic. When asked about his home life with his mother, he focused on violent and rescue themes. Each time C.E.C. talked about his mother, whom he referred to as Tanya, he said he hated her. During one session, he told McCartney that he wanted to take a gun and shoot his mother or wished the police would shoot her. McCartney testified that C.E.C. is violent and spits quite a bit, and that his behavior has caused some problems with the other children.

During the first six months of therapy, C.E.C. was extremely angry. He recounted the events surrounding the first time the department took him into custody. For several months, he talked at every session about "the glass breaking and the blood all over the place, including on his brother." McCartney testified that these recurring thoughts affected C.E.C.'s ability to focus, and that "he was just all over the place" and "could not deal with just the daily." McCartney also noted a theme concerning cockroaches that was related to Latanya, and that C.E.C. seemed scared of them.

C.E.C. stated that his maternal grandmother sometimes cared for him and that she and Latanya were physically abusive and beat him with a belt. C.E.C. told McCartney that he was afraid of his mother and that he definitely did not want to go home. During one session a week before trial, C.E.C. told McCartney that he did not want to go back to his mother and that he did not feel safe at her house. However, McCartney noted that since he has been away from his mother, some of his feelings of fear have slightly subsided and he is able to remember warm feelings and admit to missing her, although he is adamant that he does not want to return to her and wants to stay with his current foster family.

With regard to C.M.C., McCartney testified that she was very guarded and unwilling to share information during their sessions. McCartney believes that she is "either cognitive deficient or shut down emotionally." However, after C.M.C. moved into her current foster home, McCartney observed improvement in her ability to share feelings and talk about her past with her mother, and that she appeared more comfortable and confident. Notwithstanding, C.M.C. does not talk much about the night that she and her brothers were taken into custody. She told McCartney that her mom did not take care of her, that she did not feel safe with her, and that she did not want to return home to her. C.M.C. also said that her grandmother beat her and her brother and that they were scared of her.

C.M.C.'s main themes in her therapy sessions are food and nurturing. According to McCartney, C.M.C. exhibits hoarding behavior, such as digging in trash cans and hoarding food, which "is a sign that there was neglect at some point for food and nurturing."[3] In addition to hoarding,

3. The 4 C's report also noted that, according to the foster mother, C.M.C. occasionally "sneaked food." With regard to G.L.C., his foster family reported to the 4 C's examiner that G.L.C. initially ate large amounts of food in a hurried manner, sometimes resulting in vomiting due to overeating and not properly chewing his food. The examiner concluded that "[s]uch eating concerns are a likely indicator of neglect in that [G.L.C.] is likely unaccustomed to receiving consistent meals; therefore he frequently asks for food and eats large amounts in a fast manner as if he . . . fears it might be a long time before he eats again."

C.M.C. also lies and steals, and does not form attachments to others. McCartney testified that C.M.C. told her and her foster mother that Latanya had allowed her to go with men whom she did not know, and that the men kissed her and touched her, and they "made her touch their private parts."[4]

When C.M.C. and C.E.C. began therapy, they had supervised visits with their mother. McCartney observed that, after those visits, C.E.C. regressed, became more violent, and acted out more. Each time a caseworker came, C.E.C. became afraid because he thought he was being taken to see his mother. In light of his reaction, McCartney determined that it was in C.E.C.'s best interest not to see his mother. McCartney testified that after the visits ended, C.E.C. became more social, confident, and interactive, and bonded well. Although harder to read, C.M.C.'s mental state appeared to somewhat improve as well after the visits with her mother ended. McCartney testified, however, that it was harder to help C.M.C. because she had been more damaged by the home environment and lack of attachment with her mother.

With regard to their placement, McCartney testified that C.E.C. will need someone who is active, to "keep on top of him" due to his hyperactivity, and knowledgeable about how to deal with his disorder. She also testified that he will need psychiatric monitoring and continuing, regular therapy. As to C.M.C., McCartney testified that she will need a caregiver who is knowledgeable about her disorders, namely post-traumatic stress syndrome and attachment issues. Due to the disclosed sexual abuse, C.M.C. should receive sex-abuse counseling. In her report dated August 25, 2007, which was admitted at trial, McCartney concluded that C.M.C. and C.E.C. "appear to have significant signs of early abuse and neglect." McCartney further recommended that they not be reunited with their biological family unless Latanya "makes obvious, significant, and positive changes ... and is able to prove that she can take proper care of the children."

Henderson, the department case-worker, was assigned to the case in July, 2007. According to her, C.M.C. made an outcry to her therapist and to her foster mother regarding three different incidents of sexual abuse. The first incident occurred when the man "showed her the middle part" and tried to kiss her. The second incident occurred when a male babysitter with whom Latanya had left the children pulled his boxer shorts down and grabbed C.M.C.'s hand so that she could touch his genitals. The third incident occurred when a man tried to kiss her. Henderson testified that although C.E.C. supposedly made an outcry of sexual abuse, he did not disclose anything during an assessment but only talked about his belt. She testified that the foster mother with whom C.M.C. and C.E.C. lived was considering adopting them, but that the foster home for G.L.C. was not an adoptive home. According to Henderson, G.L.C.'s only special need was speech therapy which he was currently receiving.[5]

Henderson testified that, other than an anger-management class, she was unaware of any other steps Latanya had taken toward completion of the requirements in

4. In the 4 C's report, the examiner noted that C.M.C. denied any sexual abuse.

5. According to the 4 C's report, G.L.C.'s language and personal-social development are delayed. The evaluator stated that due to the chaotic home environment in which he resided with his mother, G.L.C. "has likely not received adequate parental attention and stimulation, therefore he has not learned to adequately express his needs."

her family-service plan or in the court's order. Latanya had not provided any financial assistance to her children or shown that she was financially capable of caring for C.M.C., C.E.C., and G.L.C. Latanya had also not provided any evidence of employment. Henderson testified that Latanya was living with her mother who had not been approved by CPS.[6]

Hunt, Henderson's supervisor, received the case from the previous supervisor in July, 2007. According to Hunt, there was no evidence that Latanya had successfully completed any of the services in her family plan. Hunt testified that Latanya had not inquired about her kids or what she could do to learn about them. When Hunt met with Latanya at the final permanency hearing two weeks before trial, Latanya told Henderson that she was still living with her mother. Hunt told Latanya that a home study had been conducted on her mother and that her mother's home was not approved.

Latanya indicated that she understood her family-service plan and gave Hunt a certificate indicating completion of a one-hour anger-management class. However, when Hunt expressed concern about the brevity of the class and asked Latanya what she had learned, Latanya was unable to give her an answer. When Hunt asked Latanya about C.M.C.'s hoarding behavior, Latanya responded that it meant that "she was greedy and likes everything she wanted."

At the time of trial, the foster mother for C.M.C. and C.E.C. had been caring for them for approximately two years. She testified that they missed their mother and wanted to see her, but they did not want to live with her. On one occasion, C.M.C. told her foster mother that she wanted to live with her grandmother. C.M.C. also told her that Latanya allowed men to babysit her and that, on those two or three occasions, the men would take her into a room and undress themselves. C.M.C. did not talk to her foster mother about the events that led to the department taking her into custody. The foster mother testified that she knew of one occasion when C.M.C. hoarded food at her home. Both C.M.C. and C.E.C. were doing well in school although C.M.C. has some conduct issues. The foster mother testified that she would consider adopting C.M.C. and C.E.C. but could not adopt G.L.C. because "three is too many."

Androphy, the court-appointed advocate, had been involved in the case since October, 2006. When she visited with the children the week before trial, she spoke with C.M.C. and C.E.C. separately. Androphy testified that although C.M.C. missed her mother, C.M.C. told her that she wanted to stay with her foster mother because she loves her and that she did not want to return to live with Latanya because she "does not want to be there where the windows are broken and her mother used to wallop her with a belt . . . when she was mad." C.E.C. also wanted to continue living with their foster mother because she takes care of them and they are safe there. He also mentioned windows breaking and cockroaches in his bed at his mother's house, and told Androphy that he did not want to be around the house.

Androphy testified that she spoke with Latanya after the pretrial hearing. Latanya told Androphy that she was not employed because she was disabled. She also showed three medications to Androphy, but Androphy did not know if she was consistently taking them. Latanya also told Androphy that she had completed a

---

6. The record reflects that CPS would not approve Carter as a relative placement for the children due to her extensive criminal history.

one-hour parenting class. When asked how she would address C.M.C.'s hoarding behavior, Latanya replied that she would tell her that it was not right. In November, 2006, Androphy observed a visit between Latanya and her children. She testified that other than braiding C.M.C.'s hair, Latanya did not interact with them. Although C.E.C. was hysterically crying during the visit, Latanya did not comfort him or G.L.C. Androphy testified that she did not think there was any love for or nurturing of the children, and that it was her opinion that Latanya's parental rights should be terminated.

Latanya was the last witness to testify. Prior to coming to Houston in 2005, she had lived in Plaqmine, Louisiana. Latanya did not know Henderson but testified that she had had many case-workers, one with whom she had a close relationship but who was no longer with the Department. When asked whether she thought the parenting class and anger-management class were the same thing, she testified "[y]eah but because—I took that because nobody had a parenting class that I had to take so I took a class of my own."

In his progress notes admitted at trial, Dr. Blanche indicated that although Latanya had been diagnosed five years earlier with schizophrenia, he believed that diagnosis was incorrect and that Latanya's condition was more consistent with "Schizoaffective disorder or Bipolar Disorder, complicated by substance abuse." He further noted as follows:

Her recovery from this episode of illness into remission has been a long and difficult process; however, with her demonstrated compliance, abstinence from drugs, and with supportive counseling/psycho-education in the intensive Day Partial Program—Ms. Carter has achieved a level of remission of symptoms that is *remarkable* (initially, I did not think her prognosis was favorable,

for remission or for resumption of custody).

In light of her progress (and stability) [i]t is my strong recommendation that she have an opportunity to resume custody of her children. It is my opinion that her capacity to care for her children is adequate.

I recommend a trial period of custody of her children. The conditions of this trial period should include:

1.) Continued medication compliance and regular visits with my nurse practitioner and myself in out patient treatment (or similar out patient care)

2.) Random drug screens

3.) Active supervision by Child protective services

4.) Counseling for the children as necessary, which should include parenting assistance for Latanya

5.) Latanya should continue living with her mother, and child protective services should make home visits at least twice a week to begin with.

In its closing arguments, the department requested termination of Latanya's parental rights to C.M.C., C.E.C., and G.L.C. under Texas Family Code section 161.001(E), (N), and (O), and that the department be named sole managing conservator of the children. Patricia McNally, attorney ad litem for the children, also requested that Latanya's parental rights be terminated under subsections (E),(N), and (O). At the conclusion of the trial, the court terminated Latanya's parental rights to C.M.C., C.E.C., and G.L.C. based on subsections (N) and (O). The court also appointed the department as sole managing conservator of the children.

## B. Charles

In an Affidavit of Status executed on May 25, 2006—slightly less than two

months after the children were taken into the department's custody—Latanya identified Charles as the biological father of C.M.C. and C.E.C. Five days later, on May 30, 2006, Charles contacted the department. After receiving his family-service plan, Charles returned a signed copy to his case worker. He participated in one permanency conference by telephone. Charles identified his mother, Loretta James, as a possible placement for C.M.C. and C.E.C. However, due to the size of her home and financial situation, she was ruled out as a potential relative placement.

Charles was served with the department's second amended petition on January 26, 2007. On July 24, 2007, his court-appointed attorney filed an answer in which Charles was identified as the father of C.M.C. and C.E.C. On September 18, 2007, prior to the commencement of trial, Charles's court-appointed attorney informed the court that Charles was unable to be present at the proceeding due to financial difficulties and requested that Charles be permitted to participate by telephone. The trial court denied the request. Charles's attorney also informed the court that Charles had executed a sworn statement attesting that he was the father of C.M.C. and C.E.C., and that the statement had been filed with the court. The statement was subsequently admitted into evidence without objection.

At trial, Henderson testified that Charles had contacted her in early September, 2007, and left her a voice-mail message. She returned his call but was unable to speak with him or leave a message. Hunt testified that she had spoken to Charles on the telephone on two occasions. During those calls, Charles told her that he did not want his parental rights terminated but that he was unable

to attend the trial because of financial difficulties. Androphy testified that Child Advocates had sent a letter to Charles in August, 2007, but made no other attempt to contact him, and that Charles had never contacted her. In the 4 C's report, the evaluator noted that C.M.C. "likes her biological father and that she used to visit him."

Based upon the court's finding that Charles was the alleged biological father of C.M.C. and C.E.C., the department requested that Charles's parental rights be terminated under 161.002(b)(1) and (b)(2)(B).[7] At the conclusion of the trial, the court granted the department's request and terminated Charles's parental rights. In the judgment, the court listed subsections (b)(1) and (b)(2)(B) as the grounds for termination and found that termination was in the children's best interests.

## II. Standard of Review

■ Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear-and-convincing standard. TEX. FAM.CODE § 161.001(Vernon Supp.2008); *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex.2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE § 101.007(Vernon 2002); *In re J.F.C.,* 96 S.W.3d at 264.

---

7. In closing arguments, the department indicated that the grounds upon which it would seek termination of Charles's parental rights

depended upon whether the court found Charles to be the children's father or their alleged father.

When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. *In re S.M.L.*, 171 S.W.3d 472, 476 (Tex.App.-Houston [14th Dist.] 2005, no pet.). In evaluating the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Id.* (*citing In re J.F.C.*, 96 S.W.3d at 266). In doing so, we assume the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* However, because of the heightened standard, we must also be mindful of any *undisputed* evidence contrary to the finding and consider that evidence in our analysis. *In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.")

When reviewing a factual-sufficiency challenge, the analysis is somewhat different in that we must consider all of the evidence equally, both disputed and undisputed. *See id.* In a factual sufficiency review, we must also determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *Id.; In re S.M.L.*, 171 S.W.3d at 476. If, in light of the entire record, the disputed evidence that a rea-sonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *In re S.M.L.*, 171 S.W.3d at 476; *In re J.F.C.*, 96 S.W.3d at 266.

## III.  Analysis

### A.  Latanya

In order to terminate Latanya's parental rights, the department had the burden to prove that (1) she had committed one or more acts specifically listed in section 161.001(1) of the Texas Family Code as grounds for termination; and (2) termination is in the children's best interest. TEX. FAM.CODE § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex.2005); *In re U.P.*, 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The department sought to terminate Latanya's parental rights under subsections (E), (N), and (O). In its decree for termination, the trial court recited (N) and (O) as the bases for its judgment and found that termination of Latanya's parental rights was in the best interests of the children.[8]

Under subsections (N) and (O), termination is warranted if the trial court finds by clear and convincing evidence that the parent has

(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective

---

8.  We note that although the department also sought termination of Latanya's parental rights under (E), the trial court did not rely on this subsection as grounds for its decision. Nonetheless, the department contends that because findings of fact were neither requested nor filed, "it is implied that the trial court made all the findings necessary to support its judgment, and the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence." The department then reasons that because "the record provided evidence that conclusively established a finding under [g]round (E)," it is entitled to review of this ground as a basis to uphold the trial court's judgment. However, in light of our disposition below, we need not consider the department's argument as to subsection (E).

Services or an authorized agency for not less than six months, and:

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment; [or]

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM.CODE § 161.001(1)(N) & (O).

■ The department was required to prove only one of these grounds to satisfy the first prong of section 161.001. *Wilson v. State*, 116 S.W.3d 923, 928 (Tex.App.-Dallas 2003, no pet.). We now consider the sufficiency of the evidence underlying the trial court's findings under subsection (O).

### 1. Section 161.001(O)

■ Latanya contends that the evidence is legally and factually insufficient to support termination of her parental rights under subsection (O). Specifically, she argues that the department did not meet its burden of proving that she failed to complete the requirements of her court-ordered family-service plan.

There is no dispute that, at the time of trial, the children had been in the temporary managing conservatorship of the department for not less than nine months as a result of their removal. The evidence further demonstrates, and Latanya does not dispute, that the trial court signed an order on April 11, 2006, in which it ordered Latanya to comply with each of the requirements in her Family Service Plan prepared by the Department one month earlier. The plan outlined the following tasks: (1) complete a parenting-skills training course; (2) complete a psychological evaluation; (3) complete a psychiatric evaluation; (4) take all prescribed medications; (5) maintain contact with her children through supervised family visits; (6) maintain a safe and stable home environment and refrain from criminal activity; (7) keep her family informed of her whereabouts and continue to use her family as a support system; (8) attend all court hearings, permanency-planning team meetings and scheduled family visits; and (9) maintain contact with her caseworker. On June 28, 2007, the trial court signed an additional temporary order in which it ordered Latanya to (1) complete a drug and alcohol assessment and follow all of its recommendations; (2) complete random drug tests; (3) remain drug-free; (4) demonstrate to the department that she can provide financially for her children including providing evidence of her receipt of governmental assistance and/or disability benefits; and (5) complete all services outlined in the family-service plan.

■ The record reflects that Latanya did not complete a parenting course as required by her plan and ordered by the court. At trial, Hunt and Androphy testified that although Latanya claimed to have taken a parenting class, the certificate she showed to them indicated that she had completed an anger-management class only. When asked by her attorney whether she had taken a parenting class, Latanya testified that she had taken an anger-management course because "nobody had a parenting class." While we afford due consideration to Latanya's testimony and

allow for the fact that the trial judge could have believed her testimony as to this issue, we note that Latanya's argument does not create a factual dispute as to her compliance; rather, it is in the nature of an excuse for her failure to comply. *Wilson*, 116 S.W.3d. at 929 (finding mother's argument that financial constraints prevented her from complying with provisions of court order constituted excuse for failure to comply and did not create factual dispute). The statute, however, does not make a provision for excuses. *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex.App.-Waco 2006, pet. denied); *see* TEX. FAM. CODE ANN. § 161.001(O).

In addition to a parenting class, the court also ordered that Latanya complete a drug and alcohol assessment and follow all of the recommendations of the assessment. The record reveals no evidence that Latanya completed such an assessment, and Latanya does not claim that she did. In its June 28, 2007, order, the court also ordered Latanya to submit to random drug tests. Although Dr. Blanche's progress report noted that Latanya's previous drug screens had been negative, there is no evidence demonstrating that Latanya submitted to drug tests after the court directed her to do so in its order.

Latanya was also required to demonstrate to the department that she could provide financially for her children, including providing evidence of her receipt of governmental assistance, disability benefits, or both. Androphy testified that Latanya told her that she was not employed because she was "on disability." However, we find nothing in the record indicating that Latanya provided evidence to the Department that she had received disability benefits. Further, Henderson testified that Latanya had not provided any financial assistance to her children or otherwise demonstrated that she could provide for them.

As to the requirement that Latanya maintain a safe and stable home environment, the record reflects that she began living with her mother in Louisiana after her children were taken into custody. In her formal report, Androphy advised the court that Latanya did not have a stable home due to Carter's "CPS history" and the fact that CPS would not consider Carter's home as an option for the children because of her extensive criminal history.

Reviewing all of the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Latanya failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children. The evidence is legally sufficient to support the court's finding on this ground.

Latanya argues that because she substantially complied with the provisions of the court order, the termination of her parental rights under subsection (O) cannot be upheld. In support of her position, she points to the evidence showing that she received psychiatric treatment, she has been compliant with her medication, she has abstained from drug use, and that she has not engaged in criminal activity. However, Latanya has not cited any cases, nor are we aware of any, holding that substantial compliance is sufficient to avoid a termination finding under this subsection. To the contrary, Texas courts have held that substantial compliance is not enough to avoid a termination finding under section 161.001(O). *See In re T.T.*, 228 S.W.3d 312, 319 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (noting Texas courts have uniformly found substantial compliance with provisions of court order inadequate to avoid termination finding under subsection (O)); *In re T.N.F.*, 205 S.W.3d at 630–31 (emphasizing that par-

ents must comply with every requirement of court order and that subsection (O) does not allow for consideration of excuses for non-compliance); *See also In re D.L.H.*, No. 04–04–00876–CV, 2005 WL 2989329, at *2 (Tex.App.-San Antonio Nov.9, 2005 no pet.) (mem. op. Not designated for publication) (rejecting parents' arguments that substantial compliance is sufficient to avoid finding under section 161.001(O)). In light of the entire record, we conclude the evidence is factually sufficient to support the court's finding under section 161.001(O) because a reasonable trier of fact could have formed a firm belief or conviction that Latanya failed to comply with the provisions of the court-ordered plan. Issues one and two, as they relate to section 161.001(1)(O), are overruled.

### 2. Best Interest of the Child

A statutory act or omission under section 161.001(1) must be coupled with a finding that termination of the parent-child relationship is in the best interest of the child. *See Yonko v. Department of Family & Prot. Sves.*, 196 S.W.3d 236, 242 (Tex.App.-Houston [1st Dist.] 2006, no pet.). There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent, and the burden is on the department to rebut that presumption. *In re S.M.L.*, 171 S.W.3d at 480; *In re U.P.*, 105 S.W.3d at 230. In reviewing the sufficiency of the evidence to support the second prong, a court examines several factors, including (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976); *In re S.M.L.*, 171 S.W.3d at 480; *In re U.P.*, 105 S.W.3d at 230. This list is not exhaustive, nor is evidence required on all nine factors to support a finding terminating a parent's rights. *Holley*, 544 S.W.2d at 372; *In re U.P.*, 105 S.W.3d at 230. With these considerations in mind, we review the evidence below.

As to the desires of the children, McCartney testified that C.E.C. told her that he was afraid of Latanya, hated her, and did not want to return to live with her. McCartney noted that since he has been away from Latanya, some of his feelings of fear have slightly subsided and he is able to remember warm feelings and admit to missing her, although he is adamant that he does not want to return to live with her and wants to remain with his current family. C.M.C. told McCartney that she did not want to go back to Latanya because she did not feel safe with her and Latanya did not take very good care of her.

Androphy testified that although she missed her mother, C.M.C. told her that she wanted to stay with her foster mother because she loves her and that she did not want to return to live with Latanya. C.E.C. also told Androphy that he wanted to continue living with their foster mother because she takes care of them and they are safe there. The foster mother testified that C.M.C. and C.E.C. indicated that they missed their mother and wanted to see her, but they did not want to live with her. G.E.C. was too young to express his desires.

As to the children's present emotional or physical needs, McCartney testified that both C.M.C. and C.E.C. suffer from post-

traumatic stress syndrome, C.E.C. exhibits extreme A.D.H.D., and C.M.C. shows signs of reactive-attachment disorder. As to the children's placement, she believes that C.E.C. will need someone who is active and can "keep on top of him" due to his hyperactivity, and who is knowledgeable about his disorder. In addition, C.E.C. will need psychiatric monitoring and continuing, regular therapy. As to C.M.C., McCartney testified that she will need a caregiver who is knowledgeable about her disorders, namely post-traumatic stress syndrome and attachment issues. Further, due to the disclosed sexual abuse, C.M.C. should receive sex-abuse counseling. G.L.C. needs speech therapy due to his delayed language development.

With regard to Latanya's parenting abilities, McCartney concluded that C.M.C. and C.E.C. both appeared to have "significant signs of early abuse and neglect." She testified that C.M.C.'s hoarding behavior signaled prior neglect for food and nurturing. As to G.L.C., the 4 C's examiner noted that his hurried manner of eating, resulting in occasional vomiting, likely indicated neglect and that he was unaccustomed to receiving consistent meals. Both C.M.C. and C.E.C. told McCartney that they did not feel safe with Latanya. C.E.C. told McCartney that he was afraid of Latanya, and C.M.C. said that her mother did not take very good care of her. McCartney and the foster mother both testified that C.M.C. told them that Latanya had allowed her to go with men whom she did not know and who sexually abused her. When Hunt asked Latanya about C.M.C.'s issue with hoarding food, Latanya responded that her behavior simply meant "she was greedy and likes everything she wanted." Androphy testified that there was no interaction between Latanya and her children at a supervised visit in November, 2006. Although C.E.C. was hysterically crying during the visit, Latanya did nothing to comfort him or G.L.C.

In his progress note, Dr. Blanche recommended that Latanya have an opportunity to resume custody of her children and stated that, in his opinion, "her capacity to care for her children is adequate." However, we find nothing in the record to indicate whether Dr. Blanche is aware of the children's special needs or if he took that information into consideration when he rendered his opinion. Moreover, we note that although he considers Latanya's ability to care for her children to be adequate, Dr. Blanche specifically recommended that Latanya be granted a trial period of custody with active supervision by CPS.

As for programs available to Latanya, the record reflects that although she was discharged from the out-patient day program after five days of non-attendance, she could be re-admitted to complete it if she returns. Androphy testified that Latanya told her that she was receiving disability benefits, although Latanya did not provide evidence of those benefits to the department as required in the court order.

With regard to plans for the children, the foster mother indicated that she would consider adopting C.M.C. and C.E.C. but could not adopt G.L.C. G.L.C. is currently in a foster home that is not considering adoption.

As to the stability of the home or proposed placement, McCartney testified that C.M.C. and C.E.C. made progress after they began to live with their foster families. Both children indicated to Androphy that they felt safe in their foster home and wanted to continue living there. In her report, Androphy advised the court that Latanya did not have a stable home because she lived with her mother who had a "CPS history," and the agency would not consider her mother's home for placement of the children due to her extensive criminal history.

With regard to Latanya's acts or omissions indicating that the existing parent-child relationship is not proper, there is evidence that Latanya failed to complete the court-ordered tasks to obtain the return of her children. The record also reflects that Latanya did not interact with her children during a supervised visit and did nothing to comfort C.E.C. when he became upset. As to an excuse for her failure to complete a parenting class, Latanya testified that "no one had a parenting class," and so she took an anger-management class instead.

■■■ Viewing the evidence in the light most favorable to the judgment, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that the best interests of C.M.C., C.E.C., and G.L.C. would be best served by termination of Latanya's parental rights. Based upon our review of the entire record, we conclude that a fact finder could reasonably form a firm conviction or belief that the termination of Latanya's parental rights would be in the children's best interest. We find the evidence legally and factually sufficiency to support the trial court's finding. Thus, we overrule Latanya's first and second issues as they relate to the best interest of the children. Having overruled issues one and two with regard to the trial court's findings under section 161.001(1)(O) and the children's best interest, we need not address Latanya's challenge to the trial court's findings under subsection (N). *In re T.T.*, 228 S.W.3d at 326 n. 8; *See also Wilson*, 116 S.W.3d at 928.[9]

**9.** We note that the department's brief does not address the sufficiency of the evidence supporting the trial court's finding under subsection (N). In failing to do so, it has waived any argument as to this issue on appeal. *See*

## B. Charles

The department sought termination of Charles's parental rights to C.M.C. and C.E.C. under 161.002(b)(1) and (b)(2)(B). At the conclusion of the trial, the court granted the department's request and terminated Charles's parental rights. In the judgment, the court recited (b)(1) and (b)(2)(B) as the grounds for termination and found that termination was in the children's best interests.

Section 161.002(b) of the Family Code provides that the rights of an alleged biological father may be terminated if:

(1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160; [or] (2) the child is over one year of age at the time the petition for termination of the parent-child relationship or for adoption is filed, he has not registered with the paternity registry under Chapter 160, and after the exercise of due diligence by the petitioner:

. . . .

(B) his identity is known but he cannot be located[.]

TEX. FAM.CODE § 161.002(b).

■■■ As a preliminary matter, we address Charles's assertion that termination of his parental rights could not have been based upon subsection (b)(2)(B). In paragraph 8.3 of the judgment, the trial court found that Charles "has not registered with the paternity registry." However, the remainder of the paragraph—related to the department's inability to locate the alleged father—is struck, presumably because the department knew Charles's identity as well as his location as

*Happy Harbor Methodist Home, Inc. v. Cowins*, 903 S.W.2d 884, 886 (Tex.App.-Houston [1st Dist.] 1995, no writ) (concluding party's failure to support issue with argument resulted in waiver of issue on appeal).

evidenced by the fact that it served him with its Second Amended Petition on January 26, 2007. Charles asserts that because the judgment recites only subsection (b)(1) in its entirety, the termination of his parental rights could only have been based upon that ground. We agree. We also note that the Department makes no mention of section (b)(2)(B) in its brief and, in failing to do so, has waived this issue on appeal. *See Cowins,* 903 S.W.2d at 886.

### 1. Section 161.002(b)(1)

■ In his first issue, Charles contends that the evidence is legally and factually insufficient to support the trial court's finding that he failed to timely file an admission of paternity as described under section 161.002(b)(1).

A review of the record reveals that Charles contacted the department five days after Latanya executed an affidavit of status identifying him as the father of C.M.C. and C.E.C. On the two occasions when Charles spoke to Hunt, he told her that he did not want his parental rights terminated. On July 24, 2007, Charles filed an answer with the court in which he identified himself as the father of C.M.C. and C.E.C. On September 17, 2007, the day before trial, Charles filed a sworn affidavit in which he again identified himself as their father. Charles contends that these actions satisfied the requirement under subsection (b)(1) that he file an admission of paternity.

Several of our sister courts have addressed similar issues. In *In re K.W.,* 138 S.W.3d 420 (Tex.App.-Fort Worth 2004, pet. denied), an alleged father was incarcerated during the trial on termination of his parental rights and appeared only through his court-appointed attorney. *Id.* at 423. The record revealed that after having been served with notice of the lawsuit in April 2002, he had written a letter to the department in May 2002 stating that he was the father of the child in question

and was not relinquishing his parental rights. *Id.* at 429. The alleged father also sent a similar letter to the trial court coordinator. *Id.* The trial court terminated his parental rights under section 161.002(b)(1), finding that he had failed to timely file an admission of paternity. *Id.* at 428. The court of appeals reversed the lower court's judgment, concluding that the letters to the department and the court were "admissions of paternity sufficient to put [the department] and the trial court on notice that [the alleged father] admitted his paternity and wanted to oppose termination of any rights he might have with respect to [the child]." *Id.* at 430.

The facts in *K.W.* are similar to those in this case. As in *K.W.,* Charles contacted the department shortly after being identified as the alleged father of C.M.C. and C.E.C. In his subsequent conversations with Hunt, he stated that he did not want his parental rights terminated. He also filed an answer and sworn affidavit with the court identifying himself as the children's father. Other courts have found the requirement of a timely filed admission of paternity satisfied by lesser efforts. *See Toliver v. Tex. Dep't of Family & Prot. Svcs.,* 217 S.W.3d 85, 105 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (holding trial court erred in finding alleged father, who had not filed document claiming paternity but who had appeared at trial to assert paternity and request parental rights not be terminated, had failed to timely file admission of paternity under section 161.002(b)(1)); *Estes v. Dallas Co. Child Welfare Unit,* 773 S.W.2d 800, 801–02 (Tex.App.-Dallas 1989, writ denied) (finding answer filed two weeks before trial in which alleged father identified himself as "indigent parent" was sufficient admission of paternity under former but substantively similar version of family code provision); *see also In re G.A.G.,* No. 04–07–00243–CV, 2007 WL 3355463, at *2 (Tex.App.-Houston [14th Dist.] Nov. 14,

2007, no pet.) (mem. op., not designated for publication) (reiterating that "there are no formalities that must be observed for an admission of paternity to be effective.")

Applying strict scrutiny to this termination statute, as we must, we conclude that Charles's actions were sufficient to put the department and the trial court on notice that he admitted his paternity and wanted to oppose termination of his parental rights. Moreover, we note that the department concedes this point in its brief. We therefore find that the trial court erred in finding that Charles did not timely file an admission of paternity and in terminating his parental rights to C.M.C. and C.E.C. based on section 160.002(b)(1). We sustain issue one.

### 2. Conservatorship

In his second issue, Charles contends that, in the absence of findings under sections 153.131 and 153.191, he is entitled as a matter of law to be named either managing or possessory conservator of C.M.C. and C.E.C. Sections 153.131 and 153.191 mandate the appointment of a parent or parents as managing conservator of a child in the absence of a finding that such appointment would not be in the best interest of the child and would impair or endanger the child's physical or emotional development or welfare.[10] Charles argues that because the trial court made no findings under either of these sections, and the record does not support such a finding, the parental presumption is applicable and his appointment as the children's managing conservator is statutorily mandated.

The department, however, contends that sections 153.131 and 153.191 are inapplicable because they only concern findings that must be made if a *parent* is not appointed either as managing or possessory conservator. Because Charles was never declared to be the parent of C.M.C. and C.E.C., the department reasons that there was no need to make any findings under these sections. Moreover, it asserts that Charles did not meet any of the requirements of section 160.201 to establish the existence of a father-child relationship.[11]

A review of the record reveals that, before closing arguments, the trial court asked the department to state the grounds upon which it was seeking termination.

---

10. These sections provide, in relevant part:
§ 153.131. Presumption that Parent to be Appointed Managing Conservator.
(a) Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child' physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.
§ 153.191. Presumption that Parent to be Appointed Possessory Conservator.
The court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.

Tex. Fam.Code Ann. §§ 153.131 & 153.191(Vernon's 2002).

11. Section 160.201(b) provides:
(b) The father-child relationship is established between a man and a child by:
(1) an unrebutted presumption of the man's paternity of the child under Section 160.204;
(2) an effective acknowledgment of paternity by the man under Subchapter D, unless the acknowledgment has been rescinded or successfully challenged;
(3) an adjudication of the man's paternity;
(4) the adoption of the child by the man; or
(5) the man's consenting to assisted reproduction by his wife under Subchapter H, which resulted in the birth of the child.
Tex. Fam.Code § 160.201(b)(Vernon's 2002).

The department indicated that its grounds depended upon whether the court found Charles to be the father or alleged father of C.M.C. and C.E.C. After the court found Charles to be the alleged father, the department requested termination of Charles's parental rights under section 161.002(b)(1) and (b)(2)(B) and did not argue termination under section 161.001.[12]

Having concluded that the trial court erred in finding that Charles did not timely file an admission of paternity and in terminating his parental rights to C.M.C. and C.E.C., based on section 161.002(b)(1) the question before us is whether he is entitled to be appointed the children's managing conservator. We agree with the department that sections 153.131 and 153.191 apply to a parent only. We are unaware of any cases in which these sections were applied to an alleged parent, and Charles does not direct us to any. Thus, based on the trial court's finding that Charles was an alleged parent, we conclude that it was not required to make findings under sections 153.131 or 153.191. However, we find the department's argument that the trial court's decision not to appoint Charles as managing conservator

was "because he was not a parent and he had not provided any pleadings or evidence to support appointment of him as a conservator" to be flawed. Given that the trial court found Charles to be the children's alleged father—and specifically stated that it would not find him to be their father based on his statement of paternity—it is illogical to suggest that he should then have argued that he was entitled to be named managing conservator.

Although we have been unable to locate authority addressing this precise issue, and neither party has directed us to any, we find guidance in several cases addressing the rights of a father who has filed an admission of paternity. In *Toliver*, the appeals court found that the alleged father's act of appearing at trial, unequivocal assertion that he was the child's father, and request that his parental rights not be terminated constituted a sufficient admission of paternity. 217 S.W.3d at 105. The court concluded that these actions "triggered his right to require [the department] to prove that he engaged in one of the types of conduct listed in section 161.001(1) before his parental rights could be terminated." *Id.* As subsection (b)(1) was the

---

12. The following exchange took place:

The Court: What's your request as far as Charles James?

Ms. Craven: Is he—are you finding him—

The Court: I'm asking you what's your request?

Ms. Craven: I don't—I mean he—right now he's an alleged. I have the alleged grounds and I have one for if you find him to be a father. If you find him to be a father it's a gonna be (n) and (o); he constructively abandoned and did not do Court ordered services.

If you go on alleged grounds for Charles James it's after being served with a citation, he has not timely filed an admission of paternity or counter claim. . . .

The Court: But are you—is it your request that he be established as a father based on the statement of paternity?

Ms. Craven: The Court—I know also—well—

The Court: I mean I'm not—I mean it's amazing that anybody would say that they're the father of somebody under these kinds of circumstances.

Ms. Craven: It was alleged grounds.

The Court: Okay.

Ms. Craven: I mean we don't have anything.

The Court: I'm not gonna find that he's the father based on the statement of paternity. He's the alleged biological father.

Ms. Craven: And so on that note, Your Honor, also too for Mr.—the unknown father as well as a Gerald Williams, so all three of them basically the 161.002(b)(1) because they were all served, either with a publication or personal service. And then also (b)(2)(A) for the unknown father because we did due diligence and CCJ inquiries and no paternity registry hits. And then for the two named fathers (b)(2)(B). . . .

only ground upon which the department had sought termination, the appellate court reversed the termination and remanded the case to the trial court for further proceedings. *See id.* at 106.

In *Phillips v. Texas Department of Protective & Regulatory Services,* 25 S.W.3d 348 (Tex.App.-Austin 2000, no pet.), after noting that "[s]ubsection (b)(1) allows the Department to summarily terminate the rights of an alleged biological father who does not assert his paternity," it continued....

> If, as here, the father *does* file an admission of paternity or otherwise claims paternity, then subsection (a) allows the alleged biological father to stave off summary termination of his rights and requires the Department to meet the high burden of proof found in section 161.001. The admission of paternity does not, as Phillips suggests, alter his status as an alleged biological father and confer on him the extra-statutory status of *putative* father. Rather, it merely gives him the right to proceed to trial and require the state to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination is in the best interest of his child.

*Id.* at 357 (emphasis in original). Having made this determination, the *Phillips* court then proceeded to consider whether the evidence was sufficient to support the trial court's termination of his rights based on the three grounds under section 161.001(1) asserted by the department. *See also In re A.D.,* No. 04–02–00310–CV, 2002 WL 31829510, at *1 (Tex.App.-San Antonio 2002, no pet.) (not designated for publication) (finding father's act of filing admission of paternity gave him right to require state to prove by clear and convincing evidence that he engaged in one of types of conduct listed in section 161.001(1) and that termination is in best interests of child).

We conclude that, by admitting his paternity, Charles is entitled to proceed to trial and require the department to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination of his parental rights is in the best interests of his children. Such a determination requires an evidentiary hearing and additional fact finding by the trial court. As an appeals court, we are not in a position to make such a determination.[13] Issue two is overruled.

---

**13.** When reversing the trial court's judgment or appealable order, we ordinarily render the judgment or order that the trial court should have rendered. *See* TEX.R.APP. P. 43.3. However, in a case involving the involuntary termination of parental rights, if the trial court does not order termination of the parent-child relationship (which becomes the case here because we are reversing the trial court order and are rendering judgment that appellant's parental rights are not terminated), Family Code section 161.205 requires that the trial court either (1) deny the petition for termination, or (2) render any order in the best interest of the child. *See* TEX. FAM.CODE ANN. § 161.205 (Vernon 2002). "An appellate court is not in a position to determine whether simply to deny the petition for termination or to render some other order in the best interest of the child." *Colbert v. Department of Family & Prot. Svcs.,* 227 S.W.3d 799, 816 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Circumstances concerning the child or parent may have changed since the trial court rendered its order of termination, a matter that requires a factfinder. *Id.* We are therefore unable to render a judgment that disposes of all remaining issues in the case and must remand the case in part to the trial court for further proceedings under section 161.205. *Id.* ("[S]ection 161.205 becomes applicable on remand because we have reversed the trial court order and have rendered judgment that appellant's parental rights are not terminated. Section 161.205 is the controlling authority for how the trial court must proceed."). *Id.* at n. 15.

## IV.  Conclusion

Accordingly, we affirm that portion of the order terminating the parental rights of Latanya to C.M.C., C.E.C., and G.L.C. However, we reverse that portion of the order terminating the parental rights of Charles to C.M.C. and C.E.C. and appointing the department as the sole managing conservator to C.M.C. and C.E.C., and remand the cause to the trial court for proceedings consistent with this opinion.