In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00092 CV**
_____

**IN THE INTEREST OF J.C., J.C., JR., J.C. III AND S.C.**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-209,819**

**MEMORANDUM OPINION**

L.F. appeals from the trial court's judgment terminating her parental rights to her minor children J.C., Jr., J.C., S.C., and J.C. III. We conclude the evidence is legally and factually sufficient. The trial court's judgment is affirmed.

TERMINATION OF PARENTAL RIGHTS

Before a trial court may terminate parental rights, the petitioner must establish by clear and convincing evidence that the parent has committed one or more of the acts or omissions set out in section 161.001(1) of the Family Code, and that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1), (2) (West Supp. 2012); *In re J.P.B.*, 180 S.W.3d 570, 572 (Tex. 2005). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm

1

belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

The trial court found four grounds for termination. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), and (O). The trial court also found that termination of L.F.'s parental rights was in the children's best interest.

SECTION 161.001(1)(O)

In issue one, L.F. challenges the termination ground set forth in section 161.001(1)(O), which provides as follows:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
> (1) that the parent has:
> . . . .
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(1)(O). In effect, L.F. maintains that her efforts to satisfy the service plan's requirements were sufficient.

In 2008, Priscilla Lewis, a CPS investigator, was working on a Department case involving J.C., Sr. and L.F., the parents of the four children. L.F. is also the mother of D.D., another child in the home.

Lewis testified she received a call in 2008 "regarding domestic violence in the home where [J.C., Sr.] and [L.F.] were arrested due to domestic violence." Lewis

2

indicated an officer who had been at the scene related to her that the children were outside the home during the fight, and that by the time Lewis arrived at the residence, the children were inside the apartment, the police had arrested the parents, and the parents had been taken to jail. L.F. testified the children were not outside the home during the altercation.

The Department obtained a court order requiring participation by J.C., Sr. and L.F. in Department services, including parenting classes, anger management classes, counseling sessions, and psychological evaluations. A safety plan was established, and the children were placed with an uncle. Lewis testified that L.F. completed the required services, but violated the safety plan by having visitation with her children without the ordered supervision.

In May 2010, D.D. made an outcry at school regarding alleged sexual abuse by J.C., Sr. After several unsuccessful attempts, Lewis was able to contact L.F. Lewis testified L.F. stated D.D. was not telling the truth. Lewis gave L.F. an option: either remove the children from the home and have them placed elsewhere, or remove J.C., Sr. from the home. Lewis testified L.F. became "very upset" and indicated she would leave the home, and her sister would stay in the apartment with the children. When Lewis asked L.F. why she would be willing to leave her newborn infant in the care of L.F.'s sister, L.F. had no response. L.F. continued to cry and stated she was "just leaving, [I'll] leave."

3

Apparently after further reflection, L.F. decided on the other option and indicated she would not allow J.C., Sr. to have contact with the children. The Department "completed a safety plan[.]" Part of the plan, which Lewis explained was set up for the immediate safety of the children, was for L.F. to not allow J.C., Sr. to have any contact with the children.

Lewis testified that the Department's safety plan was violated "[s]everal times[,]" because J.C., Sr. "never left the home." Lewis testified that she would go to the home, and "[J.C., Sr's] truck was parked outside" which led her "to believe that he was there." No one would answer the door. L.F. explained that the truck was half hers, and she used it part of the time. Although he was not supposed to have contact with the children, J.C., Sr. drove D.D., two of the other children, and L.F. to the place of D.D.'s interview with those investigating the allegation of sexual abuse. Lewis testified that police found J.C., Sr. in the residence on the day of the children's removal from the home in 2010.

Lewis explained the Department's position: If one child is "sexually molested," there is a danger to all the children in the home. She repeatedly explained to L.F. that she was placing her children in danger by failing to remove J.C., Sr. from the home. At the February 2, 2012 hearing, the two caseworkers involved in the investigation testified that there was not at that time an indictment of J.C., Sr. for the alleged abuse against D.D.

Michelle Thibodeaux, a CPS caseworker assigned to the case after the children's removal from the home, testified she went to the home to locate L.F. in December 2011.

4

J.C., Sr.'s vehicle was "parked right in front" of L.F.'s apartment. As Thibodeaux was leaving, she saw J.C., Sr. leaving.

In addition to safety plan violations, Thibodeaux indicated L.F. violated the service plan by failing to complete the plan's requirements. She did not complete the counseling services. L.F. attended approximately six sessions or one-half of the required classes. L.F. testified she attended all but two sessions.

The service plan provided that L.F. would visit the children on a regularly scheduled basis. Thibodeaux testified that L.F. "hasn't had visits with her children since November of 2010." Because two of the children would be upset when the mother did not appear for the scheduled visit, Thibodeaux stopped the visits.

L.F. testified she had transportation problems. Thibodeaux testified there is a city bus that stops by L.F.'s apartment complex, and the bus stops within approximately a hundred feet of the CPS office. On at least two occasions when L.F. contacted Thibodeaux and said she would be present for the visitation, Thibodeaux made arrangements for the children to be there, but L.F. did not show up. In Thibodeaux's opinion, L.F.'s conduct indicated a lack of interest in the children.

The service plan also required L.F. to obtain mental health services through Spindletop MHMR. Thibodeaux stated that Spindletop MHMR offered psychiatric treatment, as well as other services. Although L.F. had received services from Spindletop MHMR in the past, she did not try to obtain services from MHMR, as required by the

5

current service plan. L.F. testified that, because she was under the care of her own mental-health professional, she did not believe she needed to obtain the services from Spindletop MHMR.

Thibodeaux also explained that L.F. did not always keep the Department informed of her current telephone number. She frequently did not keep her appointments with the Department.

The record contains evidence regarding the Department's safety and service plans outlining requirements with which L.F. must comply in order for her to regain custody of the children. L.F. asserts that she made "every reasonable" effort to comply with the service plan.

Texas courts have held that partial compliance is not sufficient to avoid termination for failure to comply with a service plan. *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (Section 161.001(1)(O) does not set out a provision for excuses.); *Bennett v. Tex. Dep't of Family & Protective Servs.*, No. 03-07-00521-CV, 2008 WL 901202, at *8 (Tex. App.—Austin Apr. 3, 2008, no pet.) (mem. op.). An effort is not all that is required by the statute. *See In re M.C.G.*, 329 S.W.3d 674, 675-76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (supp. op. on reh'g) (citing *In re J.S.*, 291 S.W.3d at 67). Nevertheless, the record supports a conclusion that L.F. did not substantially comply with the Department's requirements. L.F. did not participate in Spindletop MHMR services; did not complete the counseling services; stopped attending

6

the visitation sessions; and permitted J.C., Sr. to have contact with the children when the safety plan prohibited it.

L.F. argues that even if she did not complete the service plan, there is no evidence this failure endangered the physical and/or emotional well-being of J.C., Jr., J.C., S.C., and J.C. III. The "endangerment" concepts relate to termination grounds under section 161.001(1)(D) and (E), not (O). To the extent that her argument implicates the "removal for abuse or neglect" language of section 161.001(1)(O), there is clear and convincing evidence in the record that L.F. violated the safety plan by allowing J.C., Sr. to have contact with the children. Evidence of the violation of the safety plan, implemented for the children's protection, establishes that the children were removed as a result of "abuse or neglect" under section 161.001(1)(O). *See In re H.S.V.*, No. 04-12-00150-CV, 2012 WL 3597211, at **1-4 (Tex. App.—San Antonio Aug. 22, 2012, no pet. h.) (mem. op.) ("self-evident that a violation of a safety plan could, in fact, constitute abuse or neglect"). L.F. also argues that the Department must make every attempt to return the children to her, but this contention is based on a provision in section 161.001(1)(N)(i), which requires the Department to make reasonable efforts to return a child before a finding of constructive abandonment can be made.

The trial judge could reasonably conclude that L.F. violated section 161.001(1)(O) by failing to comply with the trial court's order specifically establishing the actions necessary for L.F. to obtain the return of the children. *See In re C.M.C.*, 273 S.W.3d 862,

874-76 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Because the evidence is legally and factually sufficient to support the trial court's determination under section 161.001(1)(O), we do not address the other grounds for termination found by the trial court. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

BEST INTEREST

Section 161.001 also requires that termination of parental rights must be in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(2); Tex. Fam. Code Ann. § 263.307 (West 2008) (list of statutory factors); *see Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex.1976) (non-exclusive of factors in determining best interest); *see also In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

The children did not testify or speak directly to the trial court. There is evidence J.C., Jr. and J.C., the two older children, were disappointed and became upset when their mother did not attend the scheduled visitations. There is also evidence that the children did not ask for their mother. L.F. had not seen the children since November 2010.

Thibodeaux testified that J.C., Jr. has been diagnosed as being ADHD, and he is taking medication for that condition. Although he was in regular classes at the time of trial, Thibodeaux explained he was in the process of being tested for special education. He has special needs (delayed speech, difficulty with reading).

8

J.C. has had behavioral issues in school and has been diagnosed as being bipolar and having ADHD. When she first came to the foster parents, her behavioral problems included banging her head against the wall. She is "pretty stable" in the foster home and is doing very well in school. J.C.'s behavior has improved in foster care.

S.C. is in a stable placement where the foster parents have already adopted one child who had been placed in their home. When S.C. first came into foster care, he was "somewhat behind developmentally[.]" Evaluated by Early Childhood Intervention, he received services through the daycare and at home as well. Thibodeaux testified he no longer needs those services. Although developmentally delayed while in the care of L.F., he is now "caught up" on his speech. All of S.C.'s needs are being met by his foster family.

At the time of trial, J.C. III was a year and a half old. He does not have special needs. He is doing well in the foster home. Thibodeaux testified that it is likely that an adoptive home for J.C. III could be found in a short period of time.

L.F.'s child D.D. made a sexual abuse outcry against J.C., Sr. In her forensic interview, D.D. testified she told her mother of the incidents; her mother told her not to tell anyone about it; and her mother initially did not believe her. At the time of the forensic interview, J.C., Sr. was "still living there" in the home, and D.D. indicated she locked her bedroom door at night. The CASA report indicates there were allegations regarding J.C., Sr.'s drug use, but L.F. still allowed him around the children.

9

A parent's failure to comply with a service plan may affect a factfinder's consideration of the child's best interest. *In re K.S.*, No. 02-09-00331-CV, 2010 WL 2432012, at *8 (Tex. App.—Fort Worth June 17, 2010, no pet.) (mem. op.) (noting that a mother had been "unwilling to cooperate with CPS and undertake the services that would return [the child] to her"); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). Based on L.F.'s failure to take advantage of the programs available to her, the trial court could infer that she lacked motivation to improve herself as a parent, and that she would not seek to obtain the programs and assistance that the children may need for their development. *See In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.).

The Department's plan for the four children is adoption by non-relatives. Thibodeaux felt that even though J.C., Jr. and J.C. have problems, they are nonetheless adoptable and a family can be found for them. As soon as the parental rights are terminated, the Department intended to proceed with finding adoptive parents.

L.F. indicated that J.C., Sr. was still living with her at the time of the first court hearing, which was August 2010. L.F. also testified that the last time he slept at her house was June 2011. At another point, L.F. testified that J.C., Sr. "didn't live [at the apartment]. He's not on my lease." "He will come there and stuff. Yeah, he was sleeping there but not . . . living in there." There is a history of domestic violence in the home

10

between L.F. and J.C., Sr., and J.C., Sr. had been in jail at one point for assaulting a police officer.

The trial judge could consider that L.F. violated safety plans designed to protect the children from J.C., Sr.; that L.F. allowed J.C., Sr. to remain in the home and disregarded the risks he posed to the children; that she failed to complete the tasks required by the Department's service plan; that she had not visited her children since November 2010; that the children do not ask for her; that some of the children have special needs; and that the children are doing well in foster care. And the trial court could have considered the recommendations of the caseworker and the CASA volunteer that L.F.'s parental rights should be terminated. The trial court could reasonably find that it is in the best interest of the children for L.F.'s parental rights to be terminated. The judgment of the trial court is affirmed.

AFFIRMED.

_____
DAVID GAULTNEY
Justice

Submitted on August 9, 2012
Opinion Delivered October 18, 2012

Before McKeithen, C.J., Gaultney and Kreger, JJ.

11