Opinion issued February 7, 2017



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00785-CV

_____

## IN THE INTEREST OF A.D.N., M.D.N., D.J.N., AND M.M.T.N., CHILDREN

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2015-01529J

## MEMORANDUM OPINION

A.M.N., a mother, appeals the trial court's order terminating her parental rights to her four children. A.M.N. challenges the trial court's judgment on the grounds that factually and legally insufficient evidence supports the trial court's conclusions that she committed four predicate acts required for termination and that termination was in her children's best interest. We affirm.

## Background

A.M.N. ("Mother") is the mother of four children who are the subject of this suit—a six-year-old daughter, M.D.N., a four-year-old son, A.D.N., a two-year-old son, D.J.N., and a 23-month-old son, M.M.T.N. In March 2015, DFPS sued Mother seeking conservatorship and termination of her parental rights with respect to A.D.N. based on medical neglect. DFPS supported the allegations in its petition with the affidavit of DFPS investigator Heather Pohl and a physician's statement from Dr. Michael Braun, Chief of Nephrology at Texas Children's Hospital.

According to Pohl's affidavit, DFPS received four reports of Mother's child neglect between March 2014 and December 2014. DFPS received the first report in March 2014, after Mother's urine tested positive for marijuana at the birth of D.J.N. in Tulsa, Oklahoma. Two days later, DFPS received a second report after A.D.N., who was not yet two years old, was taken to a Houston hospital with a high fever by his maternal grandfather ("Grandfather"). Grandfather could not provide the hospital any identifying information about A.D.N. or Mother.[1] The hospital was uncomfortable discharging A.D.N. to Grandfather and ultimately discharged A.D.N. to his step-grandmother ("Grandmother").

---

[1] Mother told DFPS that she is estranged from Grandfather but he was the only person she could ask to take A.D.N. to the hospital because she was out of town and the person watching A.D.N. could not drive or accompany him to the hospital because she was caring for two other children.

The events that formed the basis of the third report of neglect took place in late 2014 and culminated in the hospitalization of A.D.N. on December 1, 2014. In the fall of 2014, A.D.N. was hospitalized and diagnosed with nephrotic syndrome—a condition which causes his body to produce excess fluid, overloading his kidneys. A.D.N. was readmitted to a different hospital a week later, after Mother noticed scrotal swelling. The hospital discharged A.D.N. days later, re-educated Mother regarding A.D.N.'s fluid and sodium restrictions, and scheduled a follow up appointment for late October. After his discharge, Mother spoke to the hospital by phone and reported that A.D.N.'s urine protein and edema was up and that his weight had increased by approximately seven pounds. Based on his symptoms, she stated that she would bring A.D.N. to the hospital, but she failed to do so. In mid-October 2014, A.D.N. again had to be hospitalized for three days. When the hospital discharged A.D.N., Mother was instructed to restrict A.D.N.'s fluid and sodium intake, test A.D.N.'s urine daily and record the results, and update the hospital staff weekly on A.D.N's urine protein levels. Mother did not contact the hospital until he had to be hospitalized again on December 1, 2014.

That day, Mother called 911 and reported that A.D.N. had been swelling for 5 to 7 days, not urinated for 2 days, had watery diarrhea for 3 days, and increased difficulty breathing. Emergency Medical Services transported A.D.N. to the hospital and A.D.N. was in crisis when he arrived. His symptoms were so severe that he was

3

admitted to the pediatric intensive care unit, about 14 pounds over his appropriate weight. In a Physician's Statement Regarding Injury to a Child, A.D.N.'s physician noted that "the severity of symptoms at presentation indicate significant delay in seeking care and resulted in harm to patient." The physician further noted that the severity of A.D.N.'s symptoms were consistent with medical neglect. A.D.N. remained in the hospital for months.

In mid-December 2014, DFPS received a fourth report of Mother's neglect after police found then four-year-old M.D.N. and nine-month-old D.J.N. alone in Mother's residence. According to the report, Mother's roommate was present when the deputy arrived but fled when asked for identification, leaving the children alone. The house was cluttered with garbage, clothing and toys. There was an exposed heater on the floor, though it was 70 degrees outside. Nine-month-old D.J.N. was laying on the bed, and there were pill bottles in the room and a steak knife on the floor. Pohl's affidavit describes the condition of the home as unsafe for small children. That same day, Mother, who was approximately six to seven months pregnant with M.M.T.N., tested positive for cocaine and marijuana.

According to Pohl's affidavit, Mother then agreed to work with Family Based Services and to place her children outside of the home until she completed services. At Mother's request, DFPS placed D.J.N. and M.D.N. with Grandmother and

Grandfather. Mother gave birth to her fourth child, M.M.T.N., in February 2015 and he was also placed with Grandmother as a Parental Child Safety Placement.

A.D.N. was still in the hospital in March 2015. According to DFPS's petition, upon his release from the hospital, A.D.N. would "require daily medical intervention." He would need to receive outpatient infusions five times a week and each infusion would take four hours. Additionally, A.D.N. would require oral medications, a low sodium diet, fluid restrictions, blood pressure monitoring, and urine protein testing.

The trial court granted DFPS temporary managing conservatorship of A.D.N in March 2015. In April 2015, DFPS removed D.J.N., M.D.N., and M.M.T.N from Grandmother's home following an altercation involving a gun between Grandfather and another person in front of the home. Grandmother and Grandfather were evicted and the children were placed together in a foster home. DFPS filed a first amended petition seeking termination of the parental rights of Mother with respect to all of her children and emergency conservatorship for the protection of M.D.N., D.J.N., and M.M.T.N., asserting that Mother committed one or more of the following acts or omissions:

> 15.1 knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to §161.001(1)(D), Texas Family Code;

5

15.2 engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to §161.001(1)(E), Texas Family Code;

15.3 constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children to the mother; (2) the mother has not regularly visited or maintained significant contact with the children; and (3) the mother has demonstrated an inability to provide the children with a safe environment, pursuant to §161.001(1)(N), Texas Family Code;

15.4 failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, pursuant to §161.001(1)(O), Texas Family Code.

The trial court granted DFPS temporary managing conservatorship over M.D.N., D.J.N., and M.M.T.N. the same day.

In May 2015, DFPS filed a family service plan detailing goals, tasks, and services for Mother to complete. The family service plan required Mother to:

- Complete a drug and alcohol assessment and follow any and all recommendations;

- Participate in and successfully complete an 8-week parenting class and provide DFPS with certificate of completion;

6

- Participate in individual therapy sessions;

- Complete random urine analysis throughout the duration of the case;

- Maintain stable, hazard-free housing for at least 6 months or more and provide DFPS with proof of residence;

- Maintain legal and verifiable employment and/or income for 6 months or more;

- Attend all court hearings, meetings, and all case related activities;

- Maintain contact with case worker and notify of any changes in phone numbers or address;

- Attend all medical appointments for A.D.N. after he is discharged from the hospital;

- Complete outpatient substance abuse programs and follow discharge recommendations and attend a 12 step program: NA/AA;

- Complete a psycho-social evaluation or a 4 C's assessment and follow any and all recommendations.

The family service plan noted Mother's strengths, including: (1) she was working full time, (2) she graduated high school, (3) she had a cosmetology license, (4) she was moving into a house, (5) she was cooperating with the agency, (6) she was in outpatient treatment, (7) she took responsibility for her mistakes, (8) she is attentive to A.D.N. in the hospital and visits him, (9) she provides for some of the needs of the children in foster care, (10) she shows general concern, (11) she took care of the warrants for her unpaid tickets, and (12) she completed her 4 C's assessment. The trial court approved the family service plan and noted that Mother reviewed and understood its terms and was advised that unless she is willing and able to provide

the children with a safe environment, even with the assistance of a family service plan, within the reasonable period of time specified in the plan, "her parental and custodial duties and rights may be subject to restriction or to termination or the children may not be returned to her."

In July 2015, DFPS presented a permanency plan and progress report to the court. According to the report, M.D.N., D.J.N., and M.M.T.N. lived together in the same foster home in which they were placed in April 2015. All three children had adjusted to the home and their foster parents were meeting their family, mental health, and social needs. But A.D.N. remained hospitalized. According to the July report, DFPS's primary permanency plan at the time was "family reunification."

In November 2015, DFPS presented another permanency plan and progress report to the court. DFPS had changed the primary permanency plan from "family reunification" to "unrelated adoption" in September 2015, noting that although Mother was working on her services to regain custody, she had been "untruthful about a lot of information which places the children in harms way" and still had services to complete. M.D.N., D.J.N., and M.M.T.N. continued to live together in the same foster home and their foster parents were meeting their family, mental health, and social needs. And DFPS placed A.D.N. in a separate foster home after he was discharged from the hospital where, according to the report, A.D.N.'s caregiver was meeting his educational, family, mental health and social needs. It

notes that A.D.N. visited his siblings and mother monthly. A.D.N. was taking 14 medications as he awaited a kidney transplant. The report states that A.D.N. received dialysis four times a week and recently received a GI-tube to assist him with feeding.

With regard to Mother's progress, the November 2015 report states that Mother allowed others to falsely sign her in to NA and AA meetings. It also states that Mother is said to be working as a full-time manager at Kentucky Fried Chicken, but had not provided DFPS her check stubs. According to the report, Mother completed 90 days of outpatient drug treatment in June 2015 and reported that she was participating in NA meetings weekly and had obtained a sponsor. Mother also completed her psycho-social evaluation on April 22, 2015 and completed parenting classes on June 8, 2015. The report also states that Mother had her own housing and tested negative for drugs on August 21, 2015 and September 2, 2015.

After a hearing in December 2015, the trial court entered an order noting that Mother had not demonstrated adequate compliance with the family service plan. The court ordered that the May 2015 plan continue in effect and that Mother also comply with the terms of an updated family service plan submitted by DFPS. The December 2015 family service plan required Mother to:

- Provide truthful information to all providers throughout the case;
- Participate in a drug/alcohol assessment at a provider approved by DFPS and follow all recommendations;

- Obtain and maintain stable housing for herself and her children and show proof of lease/rental agreement or mortgage with her name on it to CPS;

- Obtain a female sponsor with at least five years sobriety and provide DFPS with her sponsor name and telephone numbers;

- Cooperate fully with the Houston Police Department in regards to two rape investigations related to the alleged rape of herself and another person;

- Fully participate and attend weekly NA and AA meetings and provide case worker with her sign in and out sheet with a licensed counselor's signature;

- Pay monthly child support to the agency.

In January 2016, DFPS presented another permanency plan and progress report in which it noted that Mother was in contact with the agency but had not been truthful about pertinent information and "still needs to complete her services and demonstrate a change in her behavior to show she has alleviated or mitigated the reasons as to why the children came into care." In February 2016, the trial court entered another order stating that Mother had not demonstrated adequate compliance with the updated family service plan. In May 2016, DFPS presented another permanency plan and progress report, noting that the children remained in their foster placements. According to the report, M.D.N. was "improving significantly in school" and D.J.N. was "able to communicate better due to him learning new words." The report notes that it has "been hard to schedule the mother for drug tests due to her phone being disconnected monthly."

DFPS prepared another permanency plan and progress report in July 2016 stating that Mother "is no longer cooperating with the agency and not working her needed services." According to the report, Mother had not seen the children since March 2016. It states that according to Mother, she missed the April visit due to flooding and the May visit because she had surgery on her ankle/foot. DFPS's report further notes that Mother missed a drug test on May 16, 2016 because of work and that she missed court on June 1, 2016. According to the report, Mother also lied about recently giving birth to a baby girl in May 2016.

In September 2016, the court held a bench trial.[2] Pohl testified regarding the initial referrals related to neglect, consistent with the averments in her affidavit. Shannette McBride, the caseworker assigned to the case since the children were taken into DFPS's custody, also testified on DFPS's behalf. She stated that Mother was working on the services in her family service plan and initially appeared to be on the right track. However, DFPS discovered that Mother had lied about her progress and she later ceased communicating with DFPS. According to McBride, Mother reported that she was attending NA meetings, but DFPS learned that Mother's friend was falsely signing her in. McBride also testified that Mother was not forthcoming in her drug and psychosocial assessment. McBride testified that

---

[2] Mother was not present at the trial. Her counsel requested a continuance on the basis that Mother told her that morning that she had the flu and could not attend. The trial court denied the request for a continuance.

11

Mother had not followed the recommendations in her drug or psychosocial assessments or attended individual therapy. She also testified that Mother failed to provide DFPS with proof of income, stable housing, or employment and did not provide documentation evidencing her attendance at NA meetings or meetings with a sponsor. McBride noted that Mother is also not current on child support and has missed court hearings and several meetings. Additionally, McBride testified that Mother stopped visiting her children in March 2016, and thus had not seen them for approximately six months leading up to trial. According to McBride, Mother stated that she did not visit the children in April 2016 because her van was flooded and she missed her May visit because she was having surgery on her ankle. McBride testified that she did not hear from Mother again until the end of June 2016, and Mother did not ask to see the children. McBride later tried to contact Mother by phone and text message, but she was unable to reach her because Mother's number was disconnected. According to McBride, Mother "has pretty much abandoned the children since March" and "hasn't asked to see them."

McBride testified that A.D.N.'s foster parents are taking care of his medical needs and are interested in adopting him. She noted that they love A.D.N. and are very bonded to him. McBride also testified that the other three children remain in the same foster home and DFPS is actively seeking adoptive placements for them. She testified that Mother provided DFPS with the name of a potential placement—

a friend of Mother's adoptive parents—that the agency would look into; however, she did not think the proposed placement had ever met the children.

DFPS put on evidence of Mother's history of drug use:

- In March 2014, Mother's urine tested positive for marijuana when she gave birth to D.J.N.

- In December 2014, Mother's urine tested positive for cocaine and marijuana.

- In April 2015, Mother's hair tested positive for cocaine, benzoylecgonine and norcocaine, though her urine tested negative for drugs and ethyl glucuronide.

- In May 2015, Mother's hair and urine tested negative for drugs and ethyl glucuronide.

- In July 2015, Mother's urine tested negative for drugs.

- In September 2015, Mother's hair and urine tested negative for drugs and ethyl glucuronide.

- In December 2015, Mother's hair tested positive for cocaine, benzoylecgonine and norcocaine, though her urine tested negative for drugs and ethyl glucuronide.

- In February 2016, Mother's hair and urine tested negative for drugs and ethyl glucuronide.

Mother failed to submit to further drug testing after February 2016. McBride testified that she called Mother on several occasions to continue her testing but Mother's number changed, was disconnected, or Mother stated she was working and could not leave to take a drug test. According to McBride, Mother had not demonstrated to DFPS that she is testing clean and sober.

Finally, the children's guardian ad litem presented the expert testimony of Lisa McCartney. McCartney testified that she was familiar with and had reviewed all of the case documents and had spoken with the children and parties associated with the case. She testified that Mother had neglected A.D.N.'s medical needs on multiple occasions and left the children in unfit conditions. According to McCartney, Mother had not shown stability as evidenced by the fact that she moves around, named a variety of different men as fathers of her children with different versions of their names, tested positive for drugs after giving birth to D.J.N., used drugs when she was pregnant with M.M.T.N., and failed to receive prenatal care. McCartney further noted that Mother was not forthcoming with information about where she lives or the identities of the children's fathers.

McCartney stated that she spoke to Mother's proposed placement who stated that she had only met the oldest child, M.D.N., one time and had not met the other children. McCartney noted that the proposed placement was single and made $1900 a month in disability income for arthritis. McCartney also testified that A.D.N. was thriving in his current placement and that his placement family was taking care of him medically and wanted to adopt him. According to McCartney, A.D.N. would be eligible for a kidney transplant once he had not been hospitalized for a period of one year—an objective he was close to reaching. McCartney testified that she plans on assisting the caseworker with finding an adoptive placement for the other three

children.  According to McCartney, "[t]hey're young, and now that they'll be legally free for adoption, it should not be difficult to find them a home as a sibling group of three."

Following the trial, the trial court terminated Mother's parental rights to all four of her children pursuant to sections 161.001(b)(1)(D), (E), (N), and (O) of the Texas Family Code.[3]  Mother appealed.

## Discussion

In her first, second, third, and fourth issues, Mother asserts that the evidence was legally and factually insufficient to support the termination of her parental rights under Texas Family Code sections 161.001(b)(1)(D), (E), (N) or (O), respectively. In her fifth issue, Mother challenges the trial court's determination that termination of her parental rights was in the children's best interest.

### A.     Standard of Review

In a case to terminate parental rights under section 161.001, DFPS must establish by clear and convincing evidence: (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child.  TEX. FAM. CODE § 161.001; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).  "Clear and convincing evidence" is "the

---

[3]     DFPS also sought termination of the parental rights of various unknown and named fathers of each child in its petition.  The trial court granted the termination of the parental rights of all of these individuals, and they are not parties to the appeal.

15

measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

In conducting a legal-sufficiency review in a parental-rights-termination case brought by DFPS, we must look at the entire record to determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction about the truth of the matter on which DFPS had the burden of proof. *In re J.O.A.*, 283 S.W.3d at 344–45 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* at 344.

In conducting a factual-sufficiency review, we view all of the evidence, including disputed or conflicting evidence. *Id.* at 345. We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or

conviction" regarding the finding under review. *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

DFPS bore the burden at trial to establish that the parent committed one of the acts or omissions enumerated in section 161.001(b)(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001; *In re C.H.*, 89 S.W.3d at 23. Termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987). However, "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003). "Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights." *In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citations omitted).

## B. Termination under Section 161.001(b)(1)(O)

### 1. Applicable Law

Texas Family Code subsection 161.001(b)(1)(O) provides that the court can order termination upon a finding by clear and convincing evidence that the parent has

> (O) failed to comply with the provisions of a court order
> that specifically established the actions necessary for the

17

parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE § 161.001(b)(1)(O). "Texas courts have held that substantial compliance is not enough to avoid a termination finding under section 161.001(O)." *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

## 2. Analysis

In her fourth issue, Mother asserts that the evidence was legally and factually insufficient to support the termination of her parental rights under Texas Family Code section 161.001(b)(1)(O). But Mother then concedes in the substantive portion of her appellate brief that legally and factually sufficient evidence supports the trial court's predicate finding under (O). DFPS likewise responds that the evidence was legally and factually sufficient to establish both that Mother failed to comply with the court-ordered family service plans and that the children were in the conservatorship of DFPS for over nine months.

The record reflects that the trial court awarded DFPS temporary managing conservatorship of A.D.N. in March 2015 and of M.D.N., D.J.N., and M.M.T.N in April 2015, over 17 months before trial. Thus, the evidence is uncontroverted that DFPS had conservatorship of the children for over nine months. *See* TEX. FAM. CODE § 161.001(b)(1)(O) (requiring DFPS to have permanent or temporary

18

managing conservatorship for not less than 9 months as result of child's removal from parent under Chapter 262 for abuse or neglect of child). And Mother does not dispute that the children were removed for the reasons described in (O). *Id*.

The record further reflects that the trial court approved and ordered Mother's compliance with an initial family service plan and an updated family service plan, entered after Mother failed to comply with the initial plan. Mother admits that she did not comply with the terms of the court-ordered plans. The evidence and testimony adduced at trial also reflect that Mother did not follow all recommendations of the drug treatment facility, remain drug-free despite knowing that her parental rights could be terminated, and was untruthful to DFPS in reporting her compliance with the family service plan. McBride also testified that Mother failed to provide DFPS with proof of income, stable housing, or employment and did not provide documentation evidencing her attendance at NA meetings or meetings with a sponsor. According to McBride's testimony, Mother is delinquent on child support, and failed to attend court hearings and several meetings. Additionally, Mother stopped visiting the children in March 2016, and thus had not seen them for approximately six months before trial. Finally, she stopped appearing for drug tests over six months before trial and failed to provide DFPS with evidence that she was sober in the months before the trial. Considering all of this evidence in the light most favorable to the judgment, we conclude that a factfinder could

19

reasonably have formed a firm conviction or belief that Mother failed to comply with the court ordered family service plans. Thus, we find the trial court's finding under section 161.001(b)(1)(O) is supported by legally sufficient evidence.

We next consider, in reviewing the factual sufficiency of the evidence, all of the evidence, including disputed and conflicting evidence. The record reflects that DFPS received four reports of neglect in 2014 and that Mother tested positive for drugs at D.J.N.'s birth and two months before delivering M.M.T.N. Following the fourth report, Mother allowed DFPS to place her children outside of the home and initially began completing the services required by the first court-ordered service plan. In its May 2015 permanency report, DFPS acknowledged several of Mother's strengths including the fact that she was working full time, moving into a house, cooperating with the agency, in outpatient treatment, visiting A.D.N. regularly in the hospital, and generally showing concern. Mother also completed a drug and alcohol assessment and a psychosocial evaluation in the spring of 2015 and was reported to have completed a 90-day outpatient program for substance abuse in June 2015. She also tested negative for drug use in May, July, and September of 2015.

However, Mother later stopped complying with the terms of her plans. She tested positive for drug use in December 2015, despite her young children being removed from her custody and knowing that her parental rights were in jeopardy. She was dishonest with DFPS regarding her progress and had a friend falsely sign

20

her in at NA meetings. Mother presented no evidence controverting DFPS's evidence that she failed to provide DFPS with proof of income, stable housing, or employment. Additionally, DFPS presented uncontroverted evidence that Mother did not visit her children or submit to a drug test in the six months before trial. While the record reflects that Mother cited car troubles and medical reasons for missing her April and May 2016 visits, Mother presented no evidence that she tried to otherwise meet or interact with her children in the six months leading up to trial. Additionally, the record suggests that Mother told DFPS that she could not appear for a drug test due to work, but Mother presented no evidence that she tried to work with the caseworker to otherwise demonstrate her sobriety in the months leading up to trial.

Substantial compliance with a service plan is not sufficient to avoid a termination finding under Texas Family Code section 161.001(b)(1)(O). *See In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("The Family Code does not provide for substantial compliance with a family services plan."); *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("Texas courts have held that substantial compliance is not enough to avoid a termination finding under section 161.001(O)."). While it is undisputed that Mother completed certain tasks in her family service plans and that she initially took steps to regain custody, she ultimately failed to complete all of the tasks called for in the court-ordered plans and gave up her efforts to comply.

Viewing all the evidence presented, including any disputed or conflicting evidence, we find that a reasonable factfinder could have resolved the disputed evidence in favor of a finding that Mother failed to comply with all of the terms of the court-ordered service plans. Thus, we conclude that there is legally and factually sufficient evidence of Mother's failure to comply with the court ordered service plans to support termination of Mother's parental rights under section 161.001(b)(1)(O). Accordingly, we overrule Mother's fourth issue relating to the legal and factual sufficiency of the evidence to support the trial court's finding of a predicate act pursuant to section 161.001(b)(1)(O). In light of our holding, we need not reach her first, second, or third issues which relate to the trial court's findings of other predicate acts under section 161.001(b)(1)(D), (E), and (N).

## C. Best Interest of the Children

### 1. Applicable Law

There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). In assessing whether termination is in a child's best interest, courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger of the child now and in the future, (4) the parental abilities of

the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive. *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

DFPS "need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d at 27). However, the burden is on DFPS to rebut the presumption that the best interest of the child is served by keeping custody in the natural parents. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

### 2. Analysis

Mother argues that the evidence is insufficient to establish that termination of her parental rights is in the best interest of her children because, though DFPS has found a permanent placement for A.D.N., DFPS does not have a permanent placement for Mother's other three children. Mother contends that it is in the

children's best interest to be with their mother. DFPS disagrees, arguing that the *Holley* factors weigh in favor of termination.

Neither party presented evidence at trial of the desires of the children. While McBride testified that M.D.N. knows her mother, she noted that M.D.N. had not expressed to her that she misses Mother. Given the lack of evidence with regard to the first factor, we weigh the evidence in light of the other *Holley* factors.

"Many of the reasons supporting termination under subsection O also support the trial court's best interest finding." *In re E.C.R.,* 402 S.W.3d 239, 249 (Tex. 2013) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). First, under the second and third *Holley* factors, we consider the children's physical and emotional needs and the emotional and physical danger of the children, now and in the future. 544 S.W.2d at 371–72. Mother tested positive for drugs when she gave birth to D.J.N. and two months before giving birth to M.M.T.N. She admitted to DFPS that she failed to obtain prenatal care before giving birth to M.M.T.N. The record also reflects that Mother chose unfit caregivers for M.D.N., D.J.N., and M.M.T.N. In December 2014, before M.M.T.N. was born, Mother left M.D.N. and D.J.N. with her roommate, who fled when police arrived, leaving then four-year-old M.D.N. and nine-month-old D.J.N. alone in an unsafe environment. Mother then requested that M.D.N., D.J.N., and M.M.T.N. be placed with her father and her stepmother. In April 2015, DFPS had to take emergency possession of M.D.N., D.J.N., and

24

M.M.T.N. after receiving a report that there was an altercation involving a gun outside of the home of Mother's father and stepmother, leading to their eviction. M.D.N., D.J.N., and M.M.T.N. are currently residing together in a foster home. The three children have reportedly adjusted to their foster home and DFPS reported that M.D.N. was "improving significantly in school" and D.J.N. was "learning new words" and "able to communicate better."

A.D.N.'s medical condition creates specific physical and medical needs relevant under the second and third *Holley* factors. When A.D.N. was in his mother's care, he was hospitalized five times in nine months. With regard to A.D.N.'s December 2014 hospitalization, his doctor opined that A.D.N's symptoms were consistent with medical neglect and suggested a significant delay in seeking care which resulted in harm to A.D.N. A.D.N. remained in the hospital for months following the December 2014 hospitalization and DFPS was ultimately granted temporary conservatorship over him before his discharge. A.D.N. is currently residing in a foster home where his foster family is meeting his needs. He has not required hospitalization for almost one year, meaning that he is closer to becoming eligible for a kidney transplant. Mother failed to present any evidence that she was willing and able to meet A.D.N.'s serious medical and physical needs. She did not see any of the children, including A.D.N., in the six months before trial. While there is evidence that Mother initially took steps to treat her substance abuse and complete

the tasks in the court-ordered service plan, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346. Here, the record reflects that Mother later tested positive for drugs, despite her children being removed from her care and her knowledge that her parental rights were in jeopardy. She failed to take a drug test after February 2016 or otherwise provide evidence of her sobriety in the months leading up to trial. She also failed to present any evidence that she is employed, has a place to live, or is capable of providing the children with a safe home, free of hazards.

With respect to factors four, six, and seven, which relate to the parental abilities of the individuals seeking custody, their plans for the children, and the stability of the home or proposed placement, McBride testified that A.D.N.'s foster home is taking care of his medical needs. She stated that A.D.N.'s foster family is bonded to him and loves him and wants to adopt him. Mother does not challenge this evidence. Rather, she argues that termination is not in the best interest of the children because DFPS does not have a permanent placement for M.D.N., D.J.N., and M.M.T.N.

The Texas Supreme Court has noted that while evidence of placement plans and adoptions are relevant to a best interest determination, "the lack of evidence about definitive plans for permanent placement and adoption cannot be the

dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *In re C.H.*, 89 S.W.3d at 28; *see also In re E.C.R.,* 402 S.W.3d at 250. Rather, we must determine, based on the entire record, whether a fact finder could reasonably form a firm conviction or belief that termination of parental rights is in the children's best interest, even if DFPS has not yet "identif[ed] with precision the child[ren]'s future home environment." *In re C.H.*, 89 S.W.3d at 28; *see also In re E.C.R.,* 402 S.W.3d at 250.

The evidence reflects that, during the pendency of the case, Mother failed drug tests at D.J.N.'s birth, while pregnant with M.M.T.N., and while caring for infant children, even after she knew her parental rights were in jeopardy and her children had been removed from her custody. DFPS also presented evidence that Mother lied regarding her progress and stopped efforts to contact her children or comply with the requirements for retaining her parental rights over six months before trial. Mother offered no evidence to refute this proof. McBride testified that M.D.N., D.J.N., and M.M.T.N. are currently all living together in a foster home and that the agency is actively searching for suitable family adoptive placements. McBride stated that she believed termination of Mother's parental rights is in the children's best interest, noting that Mother had essentially abandoned the children since March 2016 and had not asked to see them in months.

Next, there is limited evidence in the record regarding the fifth *Holley* factor—programs available to assist Mother in promoting the best interest of the children. However, according to the family service plan, Mother was required to receive individual therapy, participate in parenting classes, and complete outpatient substance abuse programs. While the record reflects that Mother completed an outpatient program in June 2015, it also reflects that Mother eventually stopped complying with the requisite program requirements mandated by the family service plan.

Finally, we consider the eighth and ninth *Holley* factors, which concern the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one and any excuse for such acts or omissions. Mother stopped visiting her children or cooperating with DFPS over six months before trial. While Mother offered the DFPS caseworker explanations for why she could not visit her children in April or May or take a drug test, she offered none for why she did not try to otherwise visit her children or comply with the court-ordered tasks in her service plan in the other months leading up to trial. The evidence establishes that even after DFPS was granted temporary conservatorship of her children and Mother had agreed to abide by the terms of the family service plan, she tested positive for drugs and failed to maintain contact with the agency and her children, including A.D.N. who suffers from a serious medical condition.

After considering the entire record, we find that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of M.D.N., D.J.N., A.D.N., and M.M.T.N, even though DFPS has not yet identified an adoptive placement for M.D.N., D.J.N. and M.M.T.N. *See In re C.H.*, 89 S.W.3d at 28. Therefore, we hold that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights was in the children's best interest. *See In re E.C.R.,* 402 S.W.3d at 250 (affirming termination was in child's best interest, finding many of the reasons supporting termination under subsection O also supported best interest finding despite no evidence child's foster family would, or would not, adopt him); *see also In re A.C.*, 394 S.W.3d 633, 642–43 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding factually and legally sufficient evidence that termination was in best interest of child where mother completed only parts of family service plan, used illegal drugs during her pregnancy, after undergoing a treatment plan, and a month after her child was removed); *In re Robinson,* 89 S.W.3d 679, 688–89 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding sufficient evidence supported finding that termination in children's best interest where mother continued to use drugs and failed to offer evidence that she had resources to provide suitable home for children or for their special needs and did not complete family support programs).

## Conclusion

We affirm the judgment of the trial court.

Rebeca Huddle
Justice

Panel consists of Justices Massengale, Brown, and Huddle.