**Affirmed and Memorandum Opinion filed August 8, 2024.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-24-00161-CV

---

## IN THE INTEREST OF Y.T.A.-D. AKA Y.D.-A. AND K.A., CHILDREN

**On Appeal from the 245th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-64890**

---

## NO. 14-24-00163-CV

---

## IN THE INTEREST OF J.A., A CHILD

**On Appeal from the 245th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-53464**

---

## M E M O R A N D U M   O P I N I O N

In these two cases tried together, the trial court terminated a mother's parental rights to two of her daughters, Y.T.A.-D. aka Y.D.-A. ("Yvette") and K.A. ("Kate"),

and one of her sons, J.A. ("Jake")[1] on predicate grounds of constructive abandonment and failure to comply with a family service plan. *See* Tex. Fam. Code § 161.001(b)(1)(N), (O). The court also found that termination was in the children's best interest and appointed the Department of Family and Protective Services (the "Department") as their sole managing conservator. On appeal, the mother ("Mother") challenges the legal and factual sufficiency of the evidence to support the predicate grounds. Because we conclude that legally and factually sufficient evidence supports the trial court's constructive abandonment finding in each cause number, we affirm the judgments.

## Background

These appeals involve three of Mother's children: Yvette, born in November 2009; Kate, born in July 2015; and Jake, born in April 2019. The Department removed Jake from Mother's care in September 2020, and Yvette and Kate were removed from their great-grandmother's care in October 2020. When the children initially came to the Department's attention, their parents were not caring for them on a day-to-day basis, and they were largely in the care of their great-grandmother. At the time that Yvette and Kate were removed, their great-grandmother was unable to care for herself or the children, and the children were found in unsanitary conditions without access to adequate food. Although the children were the subject of two suits, the record shows that both suits were heard together at each of the many subsequent hearings required by the Family Code and the merits of both cases were ultimately tried together before the bench beginning in September 2021. The court signed decrees on October 26, 2021, naming the Department as sole managing conservator and Mother, as well as the children's father, as possessory conservators.

---

[1] All of the names used for the children mentioned in this opinion are pseudonyms. *See* Tex. R. App. P. 9.8. We also refer to Yvette, Kate, and Jack collectively as the "children."

The trial court continued to hold permanency review hearings regarding the children's progress while they were in the Department's conservatorship from January through October 2022. The court's orders from those hearings reflect that the trial court put into place requirements for Mother, including an order approving Mother's family service plan and incorporating it into the court's orders.[2]

On January 20, 2023, the Department filed motions to modify the prior decrees in each case, alleging that the children's circumstances had changed and requesting termination of the parents' rights. Following the motions, the trial court continued to hold permanency review hearings and reiterated that its previous orders remained in place.

On March 24, 2023, the Department filed a family service plan for Mother. The plan notes that it was completed for Mother in September 2020, shortly before the Department filed its initial suits regarding the children, but it indicates it had recently been reviewed by the Department.[3] The plan states as its goal that the children "be placed in a stable, protective, loving and permanent home that will meet all their needs and maintain their family connection." The plan also states, "At this time, the whereabouts of [Mother] remain unknown. Currently, she has not accepted the Family Plan of Service nor has she worked any services at this time. Nor has she come forth to the agency. The Department has completed a diligent search for [Mother]." The plan lists several required actions for Mother, including that she make efforts to obtain and maintain employment and housing; complete parenting

---

[2] Although many of the orders signed by the trial court were not admitted into evidence during the trial at issue in today's case, "[w]e presume the trial court took judicial notice of its record without any request being made and without any announcement that it has done so." *In re K.F.*, 402 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

[3] The plan lists the three children from both cases, but it was filed only in the case involving Jake.

classes; sign a release of information; complete a substance abuse assessment and follow all recommendations; submit to drug testing; attend visits with the children; attend family group counseling, court hearings, and family group conferences; maintain contact with her caseworker; refrain from criminal activity; make herself available for the Department's home visits; complete a psychological evaluation and follow all recommendations; complete individual and family therapy; and participate in a domestic violence evaluation. The plan also admonished Mother that its purpose was to assist her in providing her children with a safe environment and, that if she proved unwilling or unable to do so, her parental rights could be restricted or terminated or her children might not be returned to her care. *See* Tex. Fam. Code § 263.102(b).

Trial on the Department's motions to modify commenced on January 10, 2023. Before hearing testimony, the trial court admitted several exhibits that provided details regarding Mother's and the children's progress during the pendency of the cases. Included among those exhibits were records of Mother's criminal history dating back to before the court signed the initial decrees placing the children in the Department's sole managing conservatorship. This history showed: (1) Mother was convicted of possession of a controlled substance in April 2021; (2) Mother was arrested and charged with possession of methamphetamine in March 2022; (3) Mother was adjudicated guilty on the possession charge in July 2022 after she violated her community supervision, and she was sentenced to six months in state jail; and (3) in June 2023, Mother was arrested and charged with burglary of a building and remained in jail on that charge at the time of trial in the present cases.

The December 2023 permanency progress reports filed by the Department in both cases were also admitted into evidence. The report regarding Yvette and Kate reflects that Yvette had been placed in various psychiatric units several times due to

significant challenges with her mental health and behavior, including a history of aggression towards others and self-harm. According to the report, Yvette needed intensive services, including therapy, anger management, and medication management. Yvette was diagnosed with Adjustment Disorder, ADHJD, Anxiety, Depression, Disruptive Mood Dysregulation Disorder, Child Neglect or Abandonment, PTSD, and Conduct Disorder. The report indicates that Yvette's paternal aunt "is willing to be long term placement as well as adopt the child if and when the child's behavior change[s] and is more consistent. The child's paternal aunt is a Licensed Foster Home."

Kate was living in a kinship home where she was initially placed in October 2022. Kate had also exhibited some challenging behaviors and suffered from several mental health disorders, but she was placed with her paternal grandmother with whom she bonded and who wished to adopt her. The report contained recommendations made in response to Kate's evaluations, which included individual play therapy, consultation with her school psychologist for in-school services, and medication management. Kate was reportedly doing much better after the Department's caseworker and her grandmother met with school personnel regarding "redirection options" and other possible services the school could put in place.

Jake's permanency report indicated he was four years old and lived with fictive kin. He was attending school and adjusting well. School staff gave good reports about Jake, indicating he was "meeting all his milestones" and was "on target." Jake's needs were being met in his placement, and his caregivers informed the Department that they wished to adopt him.

The permanency reports also provide details regarding Mother's progress or lack thereof. She remained in jail after being arrested for burglary. Further, Yvette's and Kate's report states that Mother "made it clear that she will not be working with

5

the agency and in[ ]fact will be suing the agency." This report further states, "[a]s of April 5, 2023 current caseworker attempted visits, attempted giving her FPOS and sending her for services. [Mother] refused to accept, engage and or respond to the agency. [Mother]'s family and friends report[] she is homeless. Law Enforcement confirm[s] during arrest." Finally, both reports list the same services Mother was to complete as those reflected in her family service plan and show that Mother had not completed any of them and had made unsatisfactory progress.

Only two witnesses testified at the one-day bench trial: the Department's caseworker, Markeasha Conley, and Jake's caregiver. Mother, who was present at trial and represented by counsel, neither testified nor called any witnesses.

Conley was assigned to these cases in October 2022. She testified that, at that time, the Department had no contact information for Mother and had not been able to speak with her. Conley spoke to the previous caseworker and reviewed the case files, but she was unaware of the last time the Department had contact with Mother. Conley spoke to the children's father and his "fictive kin family members" about how to contact Mother; she obtained a phone number for Mother but was unable to reach Mother at that number from October 2022 to April 2023.

According to Conley, in April 2023, the Department held a family group conference, the purpose of which was to address the Department's goals for the children, what had occurred so far in the case, and any required next steps. Conley asked the children's father, who was at the conference, to call Mother on the phone; Mother answered his call and participated in the conference. During the meeting, the Department's workers discussed Mother's family service plan with her and "what was expected of her in order for her children to be returned." According to Conley, Mother made it clear during the conference that she was not going to do anything that the Department asked of her. Conley stated, "Her only goal was the

intention for her to sue the Department and get her kids back."

After the conference, Conley called Mother and spoke with her again about the children and their placements, Mother's family service plan, and the possibility of meeting with her. She clarified for Mother that it was important to follow the family service plan to be reunified with her children. However, Mother reiterated that she was not going to participate and that she planned to sue the Department; Mother also told Conley that Conley did not need to contact her again and then hung up on Conley. Conley further testified that, at the time of the family group conference, the Department had created Mother's service plan and filed it with the court, the plan addressed all of the children that were in the Department's care, and Conley understood that the plan was made an order of the court.

Conley reviewed the services required by the plan, including that Mother was to maintain housing and employment; refrain from criminal activity; attend court hearings, visits with her children, and family group conferences; complete a drug and alcohol assessment; submit to random drug testing; complete a psychological exam; sign a release of information; complete parenting classes; and participate in a domestic violence assessment. Conley reported that Mother had not started or completed any of the services required by the plan.

As far as maintaining stable housing and employment, Conley testified that Mother never provided any documentation to support meeting these requirements. Conley recounted that, when she took over the cases, family members reported to her that Mother was living in a shelter near the children's paternal grandmother. When Conley went to the shelter to look for Mother, Mother was not there.

Conley testified that Mother never completed a substance abuse assessment or submitted to any drug testing. According to Conley, Mother had a long history of drug use, with past agency history showing "multiple of these kids being born

positive with drugs in their system." Conley stated that Mother's family and fictive kin told her that Mother had a long history of drug use.

According to Conley, Mother also did not refrain from criminal activity. Conley reviewed Mother's criminal history, including arrests in April 2023, May 2023, and June 2023.[4] All of these arrests occurred after the Department was named sole managing conservator for the children. The April and May arrests were for criminal trespass, and the June arrest was for burglary of a building, and Mother was still in jail on the burglary charge at the time of trial. Conley testified that Mother's criminal history and failure to complete the services on her plan showed that Mother was unable "to provide stable, legal, safe housing" or a safe and stable environment for the children.

Conley also detailed Mother's lack of visits with the children. She confirmed that Mother had the opportunity to visit the children every other week, under the Department's supervision. From the time that Conley was assigned to the case in October 2022 until trial in January 2024, Mother had not attended any scheduled visits. Conley stated that Mother attended a birthday party for one of her other children not the subject of these cases in April 2023, at which Yvette, Kate, and Jake were present. Conley was able to facilitate at least two phone conversations with Yvette and Mother because she hoped that Mother could be a source of support for Yvette as Yvette was struggling with her mental health. Finally, although Conley did not facilitate any virtual visits or phone calls between Mother and the children while Mother was in jail, she knew that relatives had supervised some phone calls with the children.

---

[4] Conley also testified regarding Mother's March 2022 arrest for felony possession of a controlled substance. A judgment adjudicating Mother's guilt for this offense was admitted into evidence, showing that Mother was sentenced to six months in state jail after pleading true to a motion to adjudicate.

8

Conley testified that Mother never reached out to her to request any visits with the children. According to Conley, Mother had spoken with the paternal relatives with whom the children were staying, but Mother had not asked those relatives for any visits either. When asked whether Mother had provided anything to or for the children, Conley stated that Mother sent the children nothing until the most recent Christmas, when she sent them gifts. Otherwise, Mother had provided no support or resources to the children's caregivers on any consistent basis.

Conley acknowledged on cross-examination that Mother's plan indicated a "Family Strengths and Needs Assessment" still needed to be completed. Conley explained that she was unable to complete the assessment directly with Mother because of her lack of communication with Mother. However, she used the information she had available to her to complete the assessment, including information from the removal affidavits, from family members, from court reports, and from Mother's criminal history. Conley also acknowledged that she had not visited Mother since Mother had been in jail, nor did Conley contact any service providers to see if they could provide services to Mother while she was incarcerated. Nonetheless, Conley detailed the efforts the Department made to reunify the children with Mother, including completing Mother's service plan, offering Mother visits with the children, and Conley's attempts to build a relationship with Mother by making efforts to visit Mother when Conley was told she was residing in a shelter and offering to meet Mother at the Department's offices. Conley also offered Mother different alternatives for building a bond with the children and told Mother where the children were living. She tried to contact Mother at the phone number she had for Mother repeatedly, but she could not get through.

Conley also described the children's placements since she took over the case. At the time of trial, Yvette was living in a hospital due to mental health issues.

During Conley's time on the case, Yvette had been through four different placements and had four in-patient hospital stays due to mental health issues. Yvette struggled with change, and consistency was very important to her; according to Conley, it was in Yvette's best interest to have a caregiver who was able to provide "consistent stability" to navigate through the mental health issues she was having. The Department had services in place for Yvette, and the Department's goal was to find an interim intensive placement that could meet Yvette's needs, including "her medical needs, her therapeutic needs, kind of around the clock." According to Conley, once Yvette made progress in therapy and had her medications balanced, the Department planned to work towards returning her to an aunt, who "adamantly" wanted Yvette back and planned to adopt Yvette once her behavior was more consistent.

When Conley was first assigned the cases, Kate and an older sibling were living in a foster home and had been through about three different foster placements. Conley immediately worked to get them placed in their current placement, with their paternal grandmother. According to Conley, living with their grandmother was "permanency" for Kate; it was her home and she felt "safe and secure" there. The paternal grandmother's goal was to adopt Kate and her sibling. As for Jake, he had been living in his current placement with fictive kin since he was about one year old and, to him, that was his permanent home.

Conley acknowledged that none of the children expressed the desire that Mother's parental rights be terminated, but she clarified that she never asked the children about termination, did not believe it was appropriate to do so, and did not believe that the younger children (Kate and Jake) even understood what termination and adoption meant. In terms of what the children did express, Conley testified that Yvette wanted to be placed back with family, to be involved in school and sports,

and to grow up and be a "productive citizen in society." Kate hoped to be a teacher and loved being with family as well, particularly her father and grandmother. Jake was "just a baby," but he was bonded in his placement with his caregivers; he loved being in his current home, maintained contact with his siblings while living there, and always spoke about his sisters.

Conley testified that she believed termination of Mother's parental rights was in the children's best interests. They were either placed with family members or fictive kin (or targeted to be placed with family, in Yvette's case), who provided for all their needs in safe, healthy, loving environments. The children's caregivers had all expressed a desire to adopt them, and the children were able to maintain their relationships and closeness in their placements because "everybody is, basically, family and always communicating. . . ."

Finally, Jake's current caregiver testified. She stated that Jake was doing well, liked school, and came home each day to recount what happened at school. The caregiver had children and testified that Jake and her children had bonded. She described Jake and one of her children like "peanut butter and jelly" because they were never apart. When asked about Jake's relationship with Mother, the caregiver stated that Jake did not really have a relationship with her. She described showing Jake a picture of Mother and telling him that she was his mother, but Jake responded, "No, . . . you my mom." The caregiver expressed hopes for Jake, including that he would grow up, continue to have a relationship with his biological siblings, and go to college and "better himself." She believed it was in Jake's best interest that she and her partner adopt Jake.

After closing arguments, the trial court took the matter under advisement. On February 15, 2024, the trial court signed orders in both cases modifying the prior order and terminating the parents' parental rights. As to Mother, the trial court found

the evidence sufficient to terminate her rights under subsections 161.001(b)(1)(N) and (O), namely constructive abandonment and failure to comply with her court ordered family service plan. The trial court also found termination was in the children's best interest and appointed the Department the children's sole managing conservator.

Mother timely noticed her appeal.

**Analysis**

Mother filed separate briefs in each of these cause numbers, but she presents the same issues for review in both causes, namely whether the evidence is legally and factually insufficient to support termination under subsections (N) and (O), constructive abandonment and failure to comply with her court-ordered family service plan.

**A.     Standards of Review**

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.— Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship,

Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at

345. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In her first two issues, Mother argues that the evidence is legally and factually insufficient to support termination under the predicate grounds on which the court relied, namely subsections 161.001(b)(N) and (O), constructive abandonment and failure to comply with a court-ordered family service plan. To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding the best-interest finding, if challenged—even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d at 232; *In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Here, we conclude that legally and factually sufficient evidence supports termination under the predicate ground of constructive abandonment, subsection 161.001(b)(N). Accordingly, we cabin our discussion to that finding in each cause number only.

## B. Constructive Abandonment

To prove constructive abandonment, clear and convincing evidence must establish that the children have been in the custody of the Department for at least six months[5] and: (1) the Department made reasonable efforts to return the children to the parent; (2) the parent has not regularly visited or maintained significant contact with the children; and (3) the parent has demonstrated an inability to provide the child with a safe environment. *See* Tex. Fam. Code § 161.001(b)(1)(N). The first element focuses on the Department's conduct; the second and third elements focus on the parent's conduct. *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Mother contends that the trial court lacked sufficient

---

[5] Mother does not dispute, and the record reflects, that the children were in the Department's custody for at least six months.

evidence to support each of the three above elements.  We disagree.

1.  *Department's Reasonable Efforts to Return the Children to Mother*

The Department's implementation of a service plan is generally considered sufficient to show it made reasonable efforts to return a child as required by subsection (N).  *See, e.g.*, *In re J.G.S.*, 550 S.W.3d 698, 704-05 (Tex. App.—El Paso 2018, no pet.); *In re L.J.G.*, No. 04-19-00347-CV, 2019 WL 6107936, at *6 (Tex. App.—San Antonio Nov. 18, 2019, pet. denied) (mem. op.).  Mother emphasizes that the Department did not follow the typical procedures for implementing Mother's plan under Chapter 263 and argues that only by adhering to these procedures can the Department be considered to have made reasonable efforts to return her children.  Additionally, Mother points out evidence that she contends weighs against a reasonable-efforts finding, including Conley's testimony that Conley did not meet with Mother before creating Mother's family service plan and that Conley did not meet with Mother while Mother was in jail.  Mother further emphasizes the absence of any evidence showing the court reviewed, approved, or adopted Mother's plan or that the Department made referrals for the services listed in the plan.

However, implementing a service plan is not the exclusive means of establishing that reasonable efforts were made.  *See In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *7 (Tex. App.— Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.) ("[W]hile implementation of a service plan is often the means by which the Department establishes its reasonable efforts to return a child to a parent, it is not the exclusive means of establishing that element." (internal quotations omitted)); *In re L.C.M.*, 645 S.W.3d 914, 921 (Tex. App.—El Paso 2022, no pet.) (recognizing, in case where family service plans were purportedly defective, that strict adherence to the family code in implementing a service plan was not required to prove constructive abandonment); *In re Z.F.S.*, No. 04-20-00489-CV,

2021 WL 603372, at *3 n.2 (Tex. App.—San Antonio Feb. 17, 2021, no pet.) (mem. op.) (responding to parent's argument that a service plan was not adopted as part of the court's orders by noting "that subsection (N) does not require the Department's 'reasonable efforts' to take the form of a service plan that is enforceable as a court order"); *see also In re A.M.E.*, No. 01-21-00214-CV, 2021 WL 4533262, at *6 (Tex. App.—Houston [1st Dist.] Oct. 5, 2021, no pet.) (mem. op.) ("When reviewing whether sufficient evidence supports termination under section 161.001(b)(1)(N), the issue is whether DFPS made reasonable efforts, not ideal efforts.").

In this case, the record reflects that the Department made reasonable efforts to return the children to Mother, particularly considering the evidence showing Mother consistently rejected the Department's attempts to contact her and engage her participation. Mother's family service plan, admitted into evidence, shows it was filed with the court on March 23, 2023, ten months before trial. The plan contains several services and requirements for Mother to complete, including maintaining stable housing and employment, parenting classes, substance abuse services, visits with the children, psychological and counseling services, and a domestic violence assessment. In contrast to Mother's contention that Conley made no referrals for these services, the plan itself contains the names and phone numbers for service providers and other resources Mother could contact to participate in the listed tasks.

Further, the record reflects that, despite the Department's efforts to locate and contact Mother, Conley was unable to get in touch with Mother to obtain her input, save for the one occasion when Mother participated in the joint conference but refused to communicate further with the Department and threatened a lawsuit. Conley testified that when she was first assigned to the case in October 2022—almost two years after the Department initially took the children into its custody—

16

the Department had been unable to locate Mother's contact information. In fact, Mother's plan states, "[a]t this time the whereabouts of [Mother] are unknown. Currently she has not accepted the Family Plan of Service nor has she worked any services at this time. Nor has she come forth to the agency. The Department has completed a diligent search for [Mother]." Conley further explained that although an assessment with the family is typically required to create a service plan, in this case, she was unable to complete Mother's assessment and instead had to rely on Department records, information from family members, court reports, and Mother's criminal history. Rather than showing that Conley neglected to involve Mother, the record reflects that Conley made reasonable efforts under the circumstances to provide Mother with a plan that gave her the opportunity to obtain her children's return.[6]

Mother points out that her family service plan indicates it was filed in the suit involving Jake, but not in the suit involving Yvette and Kate. But as noted above, the trial court's orders in both cases state that the court approved Mother's plan, made it a part of the court's orders, and required the caseworker to file the plan and circulate it with the court's orders requiring the parents' compliance. Additionally, the Department created one plan to address all the children in both cases (as well as

---

[6] The record also refutes Mother's contention that there was no evidence showing the court reviewed the service plan or that its terms were adopted by the court. The trial court held several hearings following the signing of the underlying plan, as required by the Texas Family Code, regarding the children's progress while in the Department's care. *See* Tex. Fam. Code §§ 263.501-.5031. Following one such hearing in March 2022, the court in both cases signed orders providing that family service plans for the parents were approved "as stated at the hearing" and were made orders of the court, as well as requiring the caseworker to file the plans and circulate them, with the court's orders, to the parents. Following each subsequent hearing, including after the Department filed its petitions to modify and after it filed Mother's service plan, the court repeatedly signed orders stating that all previous orders were to continue. Further, Conley testified that that the Department filed Mother's service plan with the court and that it was Conley's understanding that the plan was made an order of the court.

Mother's other children who are not subject to these cases), and the tasks and requirements for both cases were the same. Mother's plan lists all the children's names, including Yvette, Kate, and Jake, and the Department's permanency reports, filed in each case, list identical services for Mother as to both cases. Hearings and the trial were conducted jointly for both cases. Conley testified that Mother's plan addressed all the children that were in the Department's care, and it was Conley's understanding that this plan was ordered by the court. There is nothing in the record demonstrating that anyone complained of the failure to order services in one case and not the other, or that Mother was confused about the plan's requirements as they pertained to all the children involved.

Conley testified that she attempted to locate Mother and involve Mother in the children's lives, but Mother repeatedly rebuffed her efforts, telling Conley that she was planning to sue the Department for taking her children and that she did not want anything else to do with the Department. In April 2023, Conley spoke with Mother by having Father call her, and Mother participated in a family group conference. During the conference, Department personnel reviewed Mother's family service plan and explained to her what was expected of her for her children to be returned. *See In re Y.W.*, No. 04-17-00445-CV, 2017 WL 4801673, at *3 (Tex. App.—San Antonio Oct. 25, 2017, pet. denied) (mem. op.) (noting that evidence showing the Department created a family service plan and explained it to parent supported a reasonable-efforts finding under subsection (N)). Conley later spoke to Mother again and attempted to provide different alternatives to Mother to build a bond with her children, including offering Mother visits and telling Mother about the children and their placements. However, Mother again responded that she was not going to participate, told Conley not to contact her again, and hung up the phone.

Finally, the fact that Conley did not visit Mother in jail does not weigh so

heavily as to preclude the trial court's reasonable-efforts finding. Given the evidence discussed above, Conley could have determined that visiting Mother while she was in jail would also likely be ineffective to engage Mother in efforts to reunify her with the children.

In sum, both Conley's testimony and the Department's permanency reports show that Mother failed to participate in any of the services offered her, failed to take advantage of the supervised visits offered to her, failed to contact Conley to inquire about her children or ask to see them, and failed on any consistent basis to send the children or their caregivers anything to support her children's care. Based on this evidence, a reasonable fact finder could have formed a firm belief or conviction that the Department made reasonable efforts to return the children to Mother.

### 2. *Mother's Lack of Significant Contact with the Children*

Mother concedes that "a reasonable fact finder could form a firm belief or opinion that [Mother] failed to 'regularly visit' the children." Mother contends that she had "significant contacts" with her children, relying on "the consequences resulting from those contacts rather than their number." But as noted above, the evidence with respect to the second element of a subsection (N) finding focuses on the parent's conduct rather than a child's reaction or attitude to the parent. *See In re A.L.H.*, 468 S.W.3d at 744; *see also In re A.M.T.*, No. 14-18-01084-CV, 2019 WL 2097541, at *4 (Tex. App.—Houston [14th Dist.] May 14, 2019, pet. denied) (mem. op.) (analysis of whether a parent regularly visited or maintained significant contact with child focuses on parent's conduct).

Here, despite Conley's uncontested testimony regarding her efforts to explain to Mother the services offered, including visits with her children, Mother did not take advantage of the Department's offered visitation. During the three years the

19

children were in the Department's care, Mother attended a single birthday party (for another of her children) at which Yvette, Kate, and Jake were present; she spoke to Yvette twice; and she sent Christmas presents to the children the December before trial. Although Conley testified that she was aware that Mother had communicated with the children's paternal relatives with whom the children were staying, Conley further stated that Mother never asked those relatives if she could visit the children.

This court and others have found sufficient evidence of constructive abandonment with greater levels of contact with the child than Mother had in this case. *See In re T.G.*, No. 14-09-00299-CV, 2010 WL 1379977, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2010, no pet.) (mem. op.) (finding sufficient evidence of constructive abandonment where mother visited "only occasionally"); *In re R.M.*, No. 14-02-00221-CV, 2003 WL 253291, at *5 (Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (mem. op.) (finding sufficient evidence of constructive abandonment where mother visited child six times while the termination case was pending); *In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (finding sufficient evidence of constructive abandonment where parent's visits were intermittent); *In re P.R.*, 994 S.W.2d 411, 416 (Tex. App.—Fort Worth 1999, pet. dism'd w.o.j.) (finding sufficient evidence of constructive abandonment where parent had numerous, yet sporadic visits).

3. *Mother's Inability to Provide a Safe Environment for the Children*

Mother contends that the Department provided no evidence with respect to her ability to provide the children with a safe environment or her living arrangements. First, the Department's inability to adduce evidence about Mother's parenting abilities or living arrangements was due to Mother's refusal to respond to the Department's attempts to engage her in services or make any affirmative effort to demonstrate any interest in the children. *Cf. In re A.J.D.-J.*, 667 S.W.3d 813, 828

20

(Tex. App.—Houston [1st Dist.] 2023, no pet.) (explaining that "a relatively brief record is not necessarily a telltale sign of evidentiary sufficiency in cases involving parental indifferences, as there is little to record when a parent is largely or entirely uninvolved in a child's life").

Second, Conley testified that, when she was assigned these cases, Mother's family members told her that Mother was "staying at a shelter not far from paternal grandmother." But when Conley looked for Mother there, she could not find Mother. At the time of trial, Mother was in Harris County jail on a burglary charge, although the record reflects she appeared at trial. The Department's evidence demonstrated that Mother was unemployed, had no housing, was frequently incarcerated, and had no ability to provide a safe environment for the children. Mother did not provide any evidence of stable housing, employment, or income. *See In re. A.M.T.*, 2019 WL 2097541, at *6 (sufficient evidence supported third element of subsection (N) where father failed to show any ability to provide child with a home despite Department's efforts to enlist his participation); *In re T.M.*, No. 02-09-145-CV, 2009 WL 5184018, at *4-5 (Tex. App.—Fort Worth Dec. 21, 2009, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support inability to provide safe environment finding when father failed to complete service plan, did not attempt to find a place for children to live, and did not give foster mother money to care for children); *M.C. v. Tex. Dep't of Fam. & Protective Servs.*, 300 S.W.3d 305, 310 (Tex. App.—El Paso 2009, pet. denied) (holding sufficient evidence demonstrated an inability to provide the child with a safe environment when mother failed to provide basic necessities for child and had no permanent housing or employment).

In sum, the record, viewed in the light most favorable to the judgment, amply demonstrates that Mother lacked any significant interest in her children's welfare,

21

did not make any effort to demonstrate an ability to care for or provide a home to them,[7] and rebuffed any and all efforts the Department made to engage with her and provide her services. The evidence is legally and factually sufficient to support a finding by clear and convincing evidence that Mother was unable to provide a safe environment for her children.

\* \* \*

Viewing the evidence in the light most favorable to the trial court's constructive abandonment findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction that the findings are true. And considering and weighing all the evidence, including disputed or conflicting evidence, we reach the same conclusion. Accordingly, the evidence is legally and factually sufficient to support the trial court's findings of constructive abandonment in each cause number. *See, e.g.*, *In re A.M.T.*, 2019 WL 2097541, at \*4-6.

We overrule Mother's first and second issues.[8]

---

[7] When the Department removed Yvette and Kate, they were living with a great-grandmother who had become physically unable to care for them. The children were found in "deplorable" conditions, dirty and covered with feces, and living in a home that was filthy, had no food, and was unsafe for human habitation. Conley also testified that several of Mother's children tested positive for illegal substances when they were born, and Mother's family reported to the Department that she had a lengthy history of drug use. Mother did not contest any of this evidence.

[8] Because only one predicate ground is required for termination, we need not address Mother's argument with respect to ground (O). Further, Mother did not challenge the trial court's best-interest findings.

## Conclusion

Having overruled Mother's issues in both cause numbers, we affirm the judgments terminating Mother's parental rights.


/s/    Kevin Jewell
        Justice


Panel consists of Justices Jewell, Zimmerer, and Hassan.